**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SAN LUIS & DELTA-MENDOTA
WATER AUTHORITY; WESTLANDS
WATER DISTRICT; STATE WATER
CONTRACTORS; METROPOLITAN
WATER DISTRICT OF SOUTHERN
CALIFORNIA; COALITION FOR A
SUSTAINABLE DELTA; KERN COUNTY
WATER AGENCY,
                         *Plaintiffs,*

                and

STEWART & JASPER ORCHARDS;
ARROYO FARMS, LLC; KING
PISTACHIO GROVE,
                *Plaintiffs-Appellants,*

                v.

KENNETH LEE SALAZAR, as
Secretary of the Department of the
Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR; U.S.
FISH AND WILDLIFE SERVICE; ROWAN
GOULD, as Acting Director of the
U.S. Fish and Wildlife Service;

REN LOHOEFENOR, as Regional Director of the U.S. Fish and Wildlife Service, Pacific Southwest Region, U.S. Department of the Interior; UNITED STATES BUREAU OF RECLAMATION; J. WILLIAM MCDONALD, as Acting Commissioner of the U.S. Bureau of Reclamation, U.S. Department of the Interior; DONALD GLASER, as Director of the U.S. Bureau of Reclamation, Mid-Pacific Region, U.S. Department of the Interior; CALIFORNIA DEPARTMENT OF WATER RESOURCES; LESTER A. SNOW; MICHAEL L. CONNOR, Commissioner; UNITED STATES DEPARTMENT OF JUSTICE; UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; LISA JACKSON, in her official capacity as Administrator of the Environmental Protection Agency; UNITED STATES DEPARTMENT OF TRANSPORTATION; RAY LAHOOD, in his official capacity as Secretary of Transportation; MARITIME ADMINISTRATION; JAMES E. CAPONITI, in his official capacity as Acting Deputy Maritime Administrator; UNITED STATES DEPARTMENT OF HOMELAND SECURITY;

JANET NAPOLITANO, in her official
capacity as Secretary of Homeland
Security; FEDERAL EMERGENCY
MANAGEMENT AGENCY; WILLIAM
CRAIG FUGATE, in his official
capacity as Administrator of the
Federal Emergency Management
Agency; UNITED STATES ARMY
CORPS OF ENGINEERS; ROBERT VAN
ANTWERP, Lieutenant General,
           *Defendants-Appellees,*

NATURAL RESOURCES DEFENSE
COUNCIL; THE BAY INSTITUTE, non-
profit organizations,
   *Defendant-intervenors-Appellees.*

No. 10-15192

D.C. No.
1:09-cv-00407-
OWW-DLB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
February 15, 2011—San Francisco, California

Filed March 25, 2011

Before: Mary M. Schroeder and Sidney R. Thomas,
Circuit Judges, and Mark W. Bennett, District Judge.*

Opinion by Judge Thomas

_____

*The Honorable Mark W. Bennett, District Judge for the U.S. District
Court for Northern Iowa, Sioux City, sitting by designation.

## COUNSEL

James S. Burling, M. Reed Hopper, Damien M. Schiff, Brandon M. Middleton, Pacific Legal Foundation, Sacramento, California, for the plaintiffs/appellants.

Ignacia S. Moreno, Assistant Attorney General, David Shilton, Ethan Carson Eddy, Charles R. Scott, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the federal defendants/appellees.

Trend W. Orr, George M. Torgun, Earthjustice, Oakland, California, Katherine Poole, Doug Obegi, Natural Resources Defense Council, San Francisco, California, for the defendant-intervenors/appellees.

## OPINION

THOMAS, Circuit Judge:

In this appeal, we consider whether application of sections 7 and 9 of the Endangered Species Act to the California delta smelt violates the Commerce Clause in the United States Constitution. We conclude that it does not, and we affirm the judgment of the district court.

I

The delta smelt is a small fish, 60-70 millimeters in length, that is undisputedly endemic to California. Though once inhabiting California's San Francisco Bay/Sacramento-San Joaquin Delta Estuary, its range has diminished. The delta smelt presently has no commercial value, but it was commercially harvested as bait in the past.

The United States Fish and Wildlife Service ("Service") listed the delta smelt as a threatened species in 1993 under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544. 58 Fed. Reg. 12854 (Mar. 5, 1993). The Service designated critical habitat for the delta smelt in 1994. 59 Fed. Reg. 65256 (Dec. 19, 1994). And, in 2010, it announced that the delta smelt should be re-listed as endangered but that the Service would forgo re-listing for the time being on account of higher-priority listings. 75 Fed. Reg. 17667 (Apr. 7, 2010).

Section 7 of the ESA requires federal agencies to consult with the Service before undertaking any action "authorized, funded, or carried out" by the agency that might "jeopardize the continued existence of any endangered species or threatened species" or might "result in the destruction or adverse modification of habitat" used by any endangered or threatened species. 16 U.S.C. § 1536(a)(2). After the consultation, the Service provides the agency with a written statement describing how the proposed action will affect the endangered or threatened species. *Id.* at § 1536(b)(3)(A). This statement is commonly known as a "biological opinion." If the Service concludes that the proposed action will likely jeopardize the species, then it may suggest "reasonable and prudent alternatives" for agency action that, the Service believes, will not result in violations of the ESA. *Id.*

In 2008, the Service, acting under ESA § 7, 16 U.S.C. 1536(a)(2), issued a Biological Opinion to the Bureau of Reclamation ("Bureau"). The Biological Opinion concerned the

Bureau's and the California Department of Water Resource's operation of the Central Valley Project and the State Water Project, two of the world's largest water diversion projects. The Biological Opinion concluded that "the coordinated operations of [the water projects], as proposed, are likely to jeopardize the continued existence of the delta smelt" and "adversely modify delta smelt habitat."

The Biological Opinion included a "Reasonable and Prudent Alternative," as well as an "Incidental Take Statement." The Reasonable and Prudent Alternative consisted of various components designed to reduce entrainment and other "taking"[1] of smelt during critical times of the year by controlling water flows to and in the delta. If the Bureau complied with the Reasonable and Prudent Alternative, then the Incidental Take Statement would insulate the Bureau from liability under the "no-take provision" in ESA § 9, 16 U.S.C. § 1538(a)(1)(C), which prevents taking of endangered or threatened species.

II

Stewart & Jasper Orchards; Arroyo Farms, LLC; and King Pistachio Grove (collectively "the Growers") sued the Service, claiming that their almond, pistachio, and walnut orchards "experienced substantially reduced water deliveries as a result of the Service's decision to act on behalf of the delta smelt."

Among other claims, the Growers alleged that—as applied to the delta smelt—the Service's application of ESA § 7 and power to enforce the "no-take provision" in ESA § 9 were unconstitutional under the Commerce Clause. The Growers claimed that, since "the delta smelt is a purely intrastate spe-

---

[1]ESA § 9 makes it illegal to "take" an endangered or threatened species. 16 U.S.C. § 1538(a)(1)(C). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

cies, and because it has no commercial value, Sections 7(a)(2) and 9 of the ESA . . . as applied to [the operation] of the Central Valley Project and the State Water Project, are invalid exercises of constitutional authority [under the Commerce Clause]."

The Growers moved for summary judgment. The Service, along with intervenors, Natural Resources Defense Council and The Bay Council (collectively "the Environmental Parties"), cross-moved for summary judgment. The Service and the Environmental Parties argued that (1) the Growers do not have Article III standing, (2) their claim is not ripe, and (3) application of ESA §§ 7 and 9 to the operations of the water projects is a valid exercise of Congress' power under the Commerce Clause. *In re Delta Smelt Consolidated Cases*, 663 F. Supp. 2d 922, 926 (E.D. Cal. 2009).

The district court denied the Growers' motion and granted the Service's and Environmental Parties' cross-motions. With respect to the issue of standing, the district court first noted that while the Growers' complaint challenges sections "7(a)(2) and 9" of the ESA, the motion for summary judgment "focuses exclusively on the theory that the application of *Section 9's* take prohibition to the smelt exceeds Congress' authority under the Commerce Clause." *Id.* at 929 (emphasis original). Nevertheless, the court concluded, "[T]here is no dispute that Plaintiffs have standing to bring a section 7 claim." *Id.* at 931. But the court determined the Growers do not have standing to bring a § 9 claim. *Id.* at 929-31. It reasoned, "Given that there is no threat of imminent Section 9 enforcement in this case, there is no causal connection between Plaintiffs' injury and the conduct complained of, namely Section 9's application to the coordinated operation of the project." *Id.* at 931.

The district court similarly decided that the ESA § 9 claim is not ripe: "Plaintiffs point to no concrete plans on the part of project operators to violate the ESA, no communication of

a specific warning or threat to initiate enforcement proceedings, nor any history of past prosecution or enforcement against the project operators." *Id.*

Even though the district court concluded that the Growers were not advancing their motion under ESA § 7 and that they did not have standing under ESA § 9, the court went on to address the merits of the Commerce Clause challenge. *Id.* at 931. Because the Service and the Environmental Parties had cross-moved for summary judgment on application of "Sections 7(a)(2) and 9" together, the district court addressed the Commerce Clause challenge to ESA § 7. *Id.* It rejected the challenge, though. *Delta Smelt*, 663 F. Supp. 2d at 945. It held that the Service's protection of the delta smelt was valid under the Commerce Clause, even though the delta smelt is, by all accounts, a purely intrastate species.

The Growers timely filed their appeal. We have jurisdiction over the Growers' appeal under 28 U.S.C. § 1291 and 5 U.S.C. § 704.

## III

The Growers have Article III standing to challenge the no-take provision in ESA § 9 because the Service's coercive power to enforce ESA § 9 caused the Bureau to reduce water flows, which injured the Growers. *See Bennett v. Spear*, 520 U.S. 154, 169 (1997).

**[1]** Article III of the United States Constitution confines federal courts to hearing only "cases" and "controversies." *Barnum Timber Co. v. EPA*, __ F.3d __, 2011 WL 383012, at *2 (9th Cir. Feb. 3, 2011). "Standing is a core component of the Article III case or controversy requirement." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish Article III standing: (1) a plaintiff "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual

or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of independent action of some third party not before the court"; and (3) "it must be likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61; *see also Barnum Timber Co.*, 2011 WL 383012, at *2. Here, the Growers meet each of these "relatively modest" requirements. *See Bennett*, 520 U.S. at 171.

## A

**[2]** The Growers have sufficiently alleged an injury in fact because they claim "the issuance of the [Biological Opinion] has resulted in reduced water deliveries to south-of-Delta users . . . ." *Delta Smelt*, 663 F. Supp. 2d at 930. The adverse consequences flowing from the reduction in water delivery are "concrete and particularized" and "actual or imminent." *See Lujan*, 504 U.S. at 560; *see also Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1086 (9th Cir. 2003) ("[L]oss of affordable irrigation water for [individual farmers'] agricultural lands" is an injury in fact.). The Growers, therefore, satisfy the first of *Lujan*'s three requirements.

## B

The direct cause of the Growers' injury is the Bureau's reduction of water flow. But the Service's power to enforce the no-take provision in ESA § 9 is an indirect cause since that power has coerced the Bureau to comply with the Biological Opinion by reducing water flow.

**[3]** Article III standing cannot be supported by the "independent action of some third party not before the court," but "that does not exclude injury produced by determinative or coercive effect upon the action of someone else." *Bennett*, 520 U.S. at 169. In *Bennett*, the Supreme Court held that

ranchers in Oregon had standing to challenge a Biological Opinion issued by the Service because the Opinion caused the Bureau to reduce water flows, which injured the ranchers. *Id.* at 169-71. The Supreme Court reached this conclusion because the Biological Opinion had a "powerful coercive" or "determinative" effect on the Bureau's regulation of water flow. *Id.* at 169-70.

**[4]** The Biological Opinion in *Bennett* had a determinative or coercive effect on the Bureau precisely because the Bureau would be subject to the Service's enforcement of the no-take provision in ESA § 9 if it failed to comply with the Opinion.[2] *Id.* at 170. The Supreme Court remarked that the Bureau was free to disregard the Biological Opinion, but it would do so "at its own peril," since any person who knowingly takes an endangered species—in violation of ESA § 9—is "subject to substantial civil and criminal penalties." *Id.* at 170; *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1240 (9th Cir. 2001) ("[T]he action agency rarely, if ever, chooses to disregard the terms and conditions of an Incidental Take Statement [in a Biological Opinion].").

**[5]** In other words, the determinative or coercive effect of a Biological Opinion stems directly from the Service's power to enforce the no-take provision in ESA § 9. As the Biological Opinion here stated, "The measures [in the Incidental Take Statement] are nondiscretionary and must be implemented by [the Bureau] . . . in order [to be exempt from the no-take provision in ESA § 9]." The Growers' injury, then—although directly caused by Bureau's compliance with the Biological

---

[2]The Service distinguishes *Bennett* on the ground that *Bennett* did not involve a challenge to the no-take provision in ESA § 9. Instead, the plaintiffs there challenged the Biological Opinion issued under ESA § 7. The Service's point is well taken, but *Bennett* does not foreclose the possibility that a plaintiff might have standing to challenge the no-take provision in ESA § 9 following the Service's issuance of a Biological Opinion. If anything, *Bennett* makes clear that such a plaintiff has standing on account of ESA § 9's "determinative and coercive effect." *See* 520 U.S. at 169-70.

Opinion—is "fairly traceable" to the Service's ability to enforce ESA § 9. *Lujan*, 504 U.S. at 560-61.

The district court concluded the Growers did not have standing because "there is no threat of *imminent* Section 9 enforcement in this case" and, as a result, "there is no causal connection between Plaintiffs' injury and the conduct complained of, namely Section 9's application to the coordinated operation of the project." *Delta Smelt*, 663 F. Supp. 2d at 931 (emphasis added). But, in *Bennett*, the Supreme Court held that—regardless of whether the threat of section 9 enforcement was imminent—the Service's *ability* to enforce ESA § 9 had a "powerful coercive" and "determinative" effect. *Id.* at 169-70.

**[6]** *Bennett* illustrates the peril of applying the concept of imminency (which belongs in the injury analysis) to the causation analysis. In *Bennett*, as here, the fact that enforcement was *not* imminent arguably exemplifies the determinative or coercive effect of the Service's enforcement power. The Service might never enforce ESA § 9 precisely because the Bureau is keenly aware of the consequences of violating the no-take provision. In short, the Growers do not have to show a threat of imminent section 9 enforcement (and there is no authority to support such a requirement).

The Service raises two arguments germane to the causation analysis. First, it argues the Bureau was motivated to comply with the Biological Opinion on account of the "no-jeopardy provision" in ESA § 7 and not the no-take provision in ESA § 9. Thus, they claim the Growers do not have standing to sue under ESA § 9 because the "determinative or coercive effect" is attributable to ESA § 7 and not ESA § 9. The Service's argument, though, is unavailing.

The "no-jeopardy" provision in ESA § 7 requires an agency to ensure that any action it takes "is not likely to jeopardize

[³] the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2). Sections 7 and 9 of the ESA arguably create separate duties,⁴ but they do not function entirely independent of one another. Indeed, as we have observed, the core purpose of ESA § 7 is to "impose an affirmative duty to prevent violations of Section 9 upon federal agencies . . . ."⁵ *Ariz. Cattle Grower's Ass'n*, 273 F.3d at 1238; *Or. Natural Resources Council v. Allen*, 476 F.3d 1031, 1040 (9th Cir. 2007).

**[7]** And even if the no-jeopardy provision in ESA § 7 partly motivates an agency to comply with a Biological Opinion, the no-take provision in ESA § 9 still has a sufficient "determinative or coercive effect" under *Bennett* if it is a "substantial factor motivating" the agency to comply with the Biological Opinion. *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 309 (D.C. Cir. 2001). *Bennett* leaves us with little doubt that the Service's power to enforce ESA § 9

---

**³**"Jeopardize the continued existence of means to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02

**⁴**See, e.g, *Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 148 F.3d 1231, 1246 (11th Cir. 1998) (citing *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 703 (1995)); *see also Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1085-86 (9th Cir. 2001) (D.W. Nelson, J., dissenting).

**⁵**This conclusion is wholly consistent with the Supreme Court's discussion in *Bennett*:

> The action agency is technically free to disregard the Biological Opinion and proceed with its proposed action, but it does so at its own peril (and that of its employees), for 'any person' who knowingly 'takes' an endangered or threatened species[—in violation of ESA § 9—]is subject to substantial civil and criminal penalties.

520 U.S. at 170. Notably, even though ESA § 7 was plainly at issue, the Supreme Court did not hold that agencies are motivated (even in part) by liability under the no-jeopardy provision in ESA § 7.

is at least a "substantial factor motivating" agencies to comply with a Biological Opinion. That power, as a result, sufficiently establishes *Lujan's* causation requirement.

Second, the Service, relying on *Summers v. Earth Island Institute*, 129 S. Ct. 1142 (2009), argues that the Growers do not have standing to bring an as-applied challenge to ESA § 9 because the Service has not "concrete[ly] appli[ed]" it here. *Summers*, though, has little or no applicability here.

In *Summers*, environmental organizations filed suit to enjoin the U.S. Forest Service from enforcing its regulations that exempt small fire-rehabilitation and timber-salvage projects from the notice, comment, and appeal process used by the Forest Service for more significant land management decisions. 129 S. Ct. at 1147. In particular, the environmental organizations sought to prevent the Forest Service from applying the regulations to the Burnt Ridge salvage-timber sale. *Id.* at 1148. The district court granted the preliminary injunction. *Id.* Immediately afterwards, the parties settled their dispute over the Burnt Ridge sale. *Id.* The Supreme Court held that, as a result of the settlement, the environmental organizations no longer had standing to challenge the regulations because the dispute was no longer live and the regulations could not be "concrete[ly] appli[ed]" to the Burnt Ridge sale. *Id.* at 1150.

*Summers* is easily distinguishable from both this case and *Bennett*. *Summers* applies to circumstances where a regulation can no longer be applied because there is no longer a live dispute in which to apply the regulation. Here, as in *Bennett*, there is a "concrete" harm (i.e., the reduction in water flow), and the Service has the "concrete" power to apply the no-take provision in ESA § 9. As discussed above, the fact that the Service has not yet exercised that power does not diminish its "determinative or coercive effect." *See Bennett*, 520 U.S. at 170.

**[8]** In summary, the Service's ability to enforce the no-take provision in ESA § 9 has a "determinative or coercive effect" that compelled the Bureau to reduce water flows and, consequently, caused the Growers to suffer an injury.

### C

**[9]** Finally, under *Lujan*, the Growers must show that invalidating the no-take provision in ESA § 9 would redress their injury. Below, the Service apparently conceded this point: "Plaintiffs assert, and Federal Defendants do not refute, that invalidating the application of section 9 to the facts of this case would preclude enforcement of the [Biological Opinion]. In this way, invalidating section 9 would arguably redress Plaintiffs' injury . . . ." *Delta Smelt*, 663 F. Supp. 2d at 931 n.5. If the no-take provision in ESA § 9 is invalidated, the Growers' injury will "likely" be redressed because the Bureau could restore water flows without worrying about whether the flows would result in a taking. *See Bennett*, 520 U.S. at 171. The Service conceded this point below at the summary judgment hearing: "[I]f the Court were to invalidate Section 9, it would affect the [Reasonable and Prudent Alternative] and obviously the [Reasonable and Prudent Alternative] is what's causing the injury to the plaintiffs."[6]

**[10]** Because the Growers have met the three requirements under *Lujan*, they have Article III standing to challenge ESA § 9 as applied to the delta smelt.

### IV

**[11]** The Growers' as-applied challenge to ESA § 9 is ripe for our review. The district court concluded otherwise,

---

[6]And, even if ESA § 7 is not invalidated, the Bureau would have no reason to comply with the no-jeopardy provision in ESA § 7—if an agency is permitted to "take" a particular species, then it would certainly be permitted to "jeopardize the existence" of that species.

because it characterized the Growers' challenge to the no-take provision in ESA § 9 as a pre-enforcement challenge. *Delta Smelt*, 663 F. Supp. 2d at 931. As the district court observed, a pre-enforcement challenge is only ripe if a plaintiff is presented with "the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Id.* (citing *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 57 (1993)). In evaluating a pre-enforcement challenge, courts examine:

1. "whether the plaintiffs have articulated a concrete plan to violate the law in question";

2. "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and

3. "the history of past prosecution or enforcement under the challenged statute."

*Id.* (citing *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc)).

Applying these factors, the district court concluded the Growers' challenge was not ripe because they could "point to no concrete plans on the part of project operators to violate the ESA, no communication of a specific warning or threat to initiate enforcement proceedings, nor any history of past prosecution or enforcement against the project operators." *Id.* We conclude that the claims are ripe for review.

**[12]** First, unlike plaintiffs in most pre-enforcement cases, the Growers are not the target of enforcement. Consequently, the consideration of "whether the plaintiffs have articulated a concrete plan to violate the law in question," *see id.*, has little meaning because the Growers are not potential violators of ESA § 9.

**[13]** Second, unlike plaintiffs in most pre-enforcement cases, the Growers would not be injured if the challenged statute is enforced. Instead, if the Service took enforcement action against the Bureau, that would mean the Bureau had increased the water flow, which would be *favorable* to the Growers. The Growers' injury derives from the Service's coercive power to enforce ESA § 9, not enforcement itself.

**[14]** These differences are important, and, as a result, the familiar pre-enforcement analysis articulated in *Thomas* does not apply here. *See id.* Instead, we apply the more general ripeness standard the Supreme Court first articulated in *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). There the Supreme Court held that ripeness depends on two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149; *accord Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 486 (9th Cir. 2011).

**[15]** The Growers' challenge to the no-take provision in ESA § 9 is ripe under *Abbott*. First, the challenge is fit for judicial review because further factual development would not "significantly advance [the Court's] ability to deal with the legal issues presented." *Nat'l Hospitality Ass'n*, 538 U.S. at 812. Second, the Growers will suffer hardship if the court withholds consideration because the Service's continued power to enforce ESA § 9 "imposes a significant practical harm upon" the Growers. *See Natural Resource Def. Council v. Abraham*, 388 F.3d 701, 706-07 (9th Cir. 2004) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733-34 (1998)). The Growers' claim under ESA § 9 is therefore ripe.

V

The Growers' as-applied Commerce Clause challenge to ESA §§ 7[7] and 9 fails because the ESA "bears a substantial relation to commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

A

**[16]** The Commerce Clause, U.S. Const. art. 1, § 8, cl. 3, allows Congress to regulate three broad categories of activity: (1) channels of interstate commerce, (2) instrumentalities of interstate commerce, and (3) activities that have a substantial effect on interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *United States v. Morrison*, 529 U.S. 598, 610 (2000); *Raich*, 545 U.S. at 16-17.

By all accounts, the category most applicable here is the third—the "substantial effects" category. In *Lopez* and *Morrison*, the Supreme Court articulated four factors to consider when evaluating whether a law has a "substantial effect" on interstate commerce:

1.  whether the statute has anything to do with "commerce or any sort of economic enterprise, however broadly one might define those terms";

---

[7]The Service argues on appeal that the Growers abandoned their challenge to ESA § 7 because the Growers "insist[ ] only that they have standing to challenge the Biological Opinion under Section 9, . . . and that their challenge to the Biological Opinion . . . is based on Section 9 of the ESA." The Service's argument is without merit. First, regardless of their position before the district court, the court addressed ESA § 7 precisely because the Service put ESA § 7 at issue in its cross-motion for summary judgment. *Delta Smelt*, 663 F. Supp. 2d at 931-32. The district court denied the Growers' Commerce Clause claim as to both sections 7 and 9 of the ESA. And the Growers sufficiently raised their ESA § 7 claim in their opening brief before this Court. As a result, the Growers' challenge to ESA § 7 is properly before us.

*Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610;

2. whether the statute contains an "express juris-dictional element"; *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 611-12;

3. whether the "legislative history contain[s] express congressional findings regarding the effects upon interstate commerce"; *Lopez*, 514 U.S. at 562; *Morrison*, 529 U.S. at 612; and

4. whether the link between the regulated activity and the effect on interstate commerce is too "at-tenuated"; *Lopez*, 514 U.S. at 563-67; *Morrison*, 529 U.S. at 612.

We have previously held that *Lopez* and *Morrison* "estab-lished what is now the controlling . . . test for determining whether a regulated activity substantially affects interstate commerce." *United States v. Alderman*, 565 F.3d 641, 647 (9th Cir. 2009).

**[17]** In *Raich* the Supreme Court elaborated on *Lopez* and *Morrison*. 545 U.S. 1. There, the Court held that Congress may use its Commerce Clause power to prohibit the cultiva-tion and possession of marijuana, even if the cultivation and possession are wholly intrastate. *Id*. Important for the pur-poses of this case, the Court held that its precedent "firmly establishes" "Congress' power to regulate purely local activi-ties that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id*. at 17 (citing *Perez v. United States*, 402 U.S. 146, 151 (1971)*; Wickard v. Filburn*, 317 U.S. 111, 128-29 (1942)).

**[18]** The *Raich* Court went on to reiterate its holding from *Lopez* and prior cases: "[W]hen a general regulatory statute bears a substantial relation to commerce, the *de minimis* char-

acter of individual instances arising under that statute is of no consequence." 545 U.S. at 17 (citations and internal quotations omitted). Further, "That [a] regulation ensnares some purely intrastate activity is of no moment. As we have done many times before, we refuse to excise individual components of that larger scheme." *Id.* at 22; *accord United States v. McCalla*, 545 F.3d 750, 754-55 (9th Cir. 2008) (applying *Raich* to federal child pornography laws); *United States v. Stewart*, 451 F.3d 1071 (9th Cir. 2006) (applying *Raich* to federal firearm laws).

**[19]** In sum, Congress has the power to regulate purely intrastate activity as long as the activity is being regulated under a general regulatory scheme that bears a substantial relationship to interstate commerce. *Id.* Pursuant to *Raich*, when a statute is challenged under the Commerce Clause, courts must evaluate the aggregate effect of the statute (rather than an isolated application) in determining whether the statute relates to "commerce or any sort of economic enterprise." *See Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 610.

B

Our precedent is in accord with these principles. In *United States v. Bramble*, 103 F.3d 1475 (9th Cir. 1996), for example, we upheld a post-*Lopez* Commerce Clause challenge to the Eagle Protection Act, 16 U.S.C. § 668. We rejected the challenge for many of the same reasons other circuits have rejected the ESA challenges presented in this case. Notably, in *Bramble*, we observed that "[b]oth the Supreme Court and this court have, prior to *Lopez*, concluded that congressional efforts at protecting endangered and migratory species are constitutional under the commerce clause." *Id.* at 1480. *See also Leslie Salt Co. v. United States*, 896 F.2d 354, 360 (9th Cir.1990) ("The commerce clause power . . . is broad enough to extend [federal] jurisdiction to local waters which may provide habitat to migratory birds and endangered species.").

Four other circuits have addressed post-*Lopez* Commerce Clause challenges to sections 4 or 9 of the ESA, and each has rejected those challenges.[8] Of particular significance is *Alabama-Tombigbee Rivers v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007), a post-*Raich* decision involving almost identical circumstances as those confronting us here.

In *Alabama-Tombigbee,* the Eleventh Circuit relied principally on *Raich* in rejecting the plaintiffs' as-applied challenge to the ESA. The plaintiffs argued the Commerce Clause did not permit the Service to protect the Alabama sturgeon under the ESA. *Id.* at 1271. The court acknowledged that, much like the delta smelt here, the evidence tended to show that the Alabama sturgeon was a purely intrastate species. *Id.* at 1253. But, the court reasoned, if the challenged sections of the ESA were "an essential part of a larger regulation of economic activity," then whether that section "ensnares some purely intrastate activity is of no moment." *Id.* at 1273 (quoting *Raich*, 545 U.S. at 24).

[20] The Eleventh Circuit had little difficulty concluding that "the Endangered Species Act is a general regulatory statute bearing a substantial relation to commerce." *Id.* at 1273. The three other circuits that previously examined this question reached the same conclusion. *GDF*, 326 F.3d 622*; Gibbs*, 214 F.3d 483; *NAHB*, 130 F.3d 1041. And for many of the same reasons, we reached a similar conclusion in *Bramble.* 103 F.3d 1475. We and other courts have discussed at length why the protection of threatened or endangered species implicates economic concerns. To summarize:

- A species might become threatened or endan-

---

[8] *Alabama-Tombigbee Rivers v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007); *Rancho Viejo v. Norton*, 323 F.3d 1062 (D.C. Cir. 2003); *GDF Realty Invest. Ltd. v. Norton* (*GDF*), 326 F.3d 622 (5th Cir. 2003); *Gibbs v. Babbitt*, 214 F.3d 483 (4th Cir. 2000); *Nat'l Ass'n of Home Builders v. Babbitt* (*NAHB*), 130 F.3d 1041 (D.C. Cir. 1997).

gered precisely because of "overutilization for commercial . . . purposes." 16 U.S.C. § 1533(a)(1)(B); *see also Trout Unlimited v. Lohn*, 559 F.3d 946 (9th Cir. 2009).

- The ESA protects endangered or threatened species, in part, by prohibiting all interstate and foreign commerce in those species. *Alabama-Tombigbee*, 477 F.3d at 1273 (citing 16 U.S.C. § 1538(a)(1)(F)); *see generally*, 16 U.S.C. §§ 1531(a)(4)(F), 1537a, 1538(a), (c); *Man Hing Ivory & Imports, Inc. v. Deukmejian*, 702 F.2d 760 (9th Cir. 1983); *United States v. Lewis*, 518 F.3d 1171 (9th Cir. 2008).

- The ESA protects the future and unanticipated interstate-commerce value of species. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 178-79 (1978); *Bramble*, 103 F.3d at 1481.[9] We observed, "Even where the species . . . has no current commercial value, Congress may regulate under its Commerce Clause authority to 'prevent[ ] the destruction of biodiversity and thereby protect[ ] the current future interstate commerce that relies on it.' " *Conservation Force v. Manning*, 301 F.3d 985, 994 n.8 (quoting *NAHB*, 130 F.3d at 1052). The *Alabama-Tombigbee* court similarly reasoned that "[b]ecause Congress could not anticipate which species might have undiscovered scientific and economic value, it made sense to protect all those species that are

---

[9]In *Bramble*, for instance, we reasoned, "[A] national program to protect and improve the natural habitats of endangered species preserves the possibilities of interstate commerce in these species and of interstate movement of persons, such as amateur students of nature or professional scientists who come to a state to observe and study these species, that would otherwise be lost by state inaction." 103 F.3d at 1481 (citations omitted)

endangered." 477 F.3d at 1274-75 (citing *GDF*, 326 F.3d at 632).

- Regeneration of a threatened or endangered species might allow future commercial utilization of the species. *Id.* at 1275 (discussing *Gibbs*, 214 F.3d at 495); *see also Bramble*, 103 F.3d at 1482.

- Interstate travelers stimulate interstate commerce through recreational observation and scientific study of endangered or threatened species. *Gibbs*, 214 F.3d at 493; *Bramble*, 103 F.3d at 1481; 16 U.S.C. § 1531(a)(3) ("[Endangered or threatened] species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people.")

- The genetic diversity provided by endangered or threatened species improves agriculture and aquaculture, which clearly affect interstate commerce. *Alabama-Tombigbee*, 477 F.3d at 1273-74; *NAHB*, 130 F.3d at 1053; *Gibbs*, 214 F.3d at 495

**[21]** This is not an exhaustive summary, but it sufficiently illustrates that the ESA, including sections 7 and 9, "bears a substantial relation to commerce." *See Raich*, 545 U.S. at 17. Thus, even though the ESA might "ensnare[ ] some purely intrastate activity, . . . we refuse to excise individual components of that larger scheme."

The Growers, on the other hand, argue that, under *Raich*, the ESA does not have a "substantial effect" on interstate commerce. They reason that the ESA, unlike the Controlled Substance Act (which was upheld in *Raich*), is not a "comprehensive economic regulatory scheme." The Growers misconstrue *Raich*. The Supreme Court has never required that a

statute be a "comprehensive *economic* regulatory scheme" or a "comprehensive regulatory scheme *for economic activity*" in order to pass muster under the Commerce Clause. Indeed, it has never used those terms. The only requirement—which was expressly detailed in *Raich*—is that the "comprehensive regulatory scheme" have a "substantial relation to commerce." *See Raich*, 545 U.S. 17. The statute need not be a purely economic or commercial statute, as the Growers would have us believe.

**[22]** We conclude that the ESA is "substantial[ly] relat[ed]" to interstate commerce and, thus, the Growers' as-applied challenge to ESA §§ 7 and 9 fails.

## VI

**[23]** In summary, the Growers have Article III standing to challenge ESA § 9, and that claim is ripe for review. The district court properly concluded that the Growers' challenge to ESA §§ 7 and 9 fails under the Commerce Clause. We need not and do not reach any other issues urged by the parties.

AFFIRMED.