Opinion by Judge HUG; Dissent by Judge PAEZ.
OPINION
HUG, Circuit Judge:
In this appeal, we address whether the renewal of forty-one water supply contracts by the United States Bureau of Reclamation violates § 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2) and illegally threatens the existence of the delta smelt. We conclude that it does not, and we affirm the judgment of the district court.
*1095 I. BACKGROUND
A. Factual Background
The delta smelt is a small fish endemic to the San Joaquin and Sacramento Rivers Delta Estuary which was declared endangered by the United States Fish and Wildlife Service under the Endangered Species Act in 1993. Though previously abundant, the population of the delta smelt has diminished markedly in the last several decades. “The delta smelt presently has no commercial value, but it was commercially harvested as bait in the past.” San Luis & Delta-Mendota Water Auth. v. Salazar, 638 F.3d 1163, 1167 (9th Cir.2011).
Plaintiffs, several conservation groups, argue that in 2005 the United States Bureau of Reclamation (“Bureau”) renewed forty-one water service contracts with various water users without conducting an adequate consultation under § 7(a)(2) of the Endangered Species Act and that the contracts jeopardize the existence of the delta smelt. The contracts at issue fall into two groups: (1) users who obtain water from the Delta-Mendota Canal (“DMC Contractors”); and (2) parties who claim to hold water rights senior to those held by the Bureau with regard to the Central Valley Project and who previously entered into settlement contracts with the Bureau (“Settlement Contractors”).
Generally, the Bureau is a federal water management agency which operates the Central Valley Project (“CVP”). The CVP is a network of dams, reservoirs, and pumping facilities which regulates the flow of water in the San Joaquin and Sacramento Rivers. California’s State Water Project (“SWP”) operates the same watershed as the CVP and both offices convey water by pumping water from the two rivers. The SWP consists of dams, canals, and pumping plants and is “the state analogue to the Central Valley Project.” Sierra Club v. Andrus, 610 F.2d 581, 586 (9th Cir.1979), rev’d on other grounds, California v. Sierra Club, 451 U.S. 287, 290-91, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981).
The Bureau and SWP have coordinated management of CVP. The joint effort began in the 1930s when the Bureau assumed control of it because California could not finance the project. The Bureau had to obtain water rights under state law to operate CVP and a dispute arose regarding the priority of pre-project water rights. Under California law, a senior holder of water rights has the right “to fulfill his needs before a junior appropriator is entitled to use any water.” United States v. State Water Resources Control Bd., 182 Cal.App.3d 82, 102, 227 Cal.Rptr. 161 (Cal.Ct.App.1986). The California Water Rights Board held hearings on the matter and issued a decision allowing the Bureau to use CVP water if it first addressed the issue of the holders asserting senior water rights. The Board recognized that senior water rights existed, though undefined, and required a settlement.
In 1964, the Bureau and those asserting senior water rights entered into 145 settlement contracts for 40-year terms. The contracts did not resolve the seniority claims, but guaranteed Settlement Contractors a certain amount of “base water” annually without any fee and other “project water” for which they would pay a fee to receive. The “base water” could only be reduced by 25% in very dry years.
The Bureau also contracted with a coalition of water service contractors who obtained water from the Delta-Mendota Canal, the DMC Contractors. These contracts provided for water delivery to the DMC Contractors annually which the contractors paid the Bureau to receive. Like the Settlement Contracts, these contracts were also long-term water supply contracts.
*1096 B. Statutory Framework
The Endangered Species Act (“ESA”) “has both substantive and procedural provisions designed to protect endangered species and their habitat.” American Rivers v. Nat’l Marine Fisheries Serv., 126 F.3d 1118, 1121 (9th Cir.1997). Under § 7(a)(2) of the ESA, federal agencies are required to “insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species.” 16 U.S.C. § 1536(a)(2). An agency which proposes the action must determine whether its action may affect the listed species or critical habitat and present its conclusions in a biological assessment. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If the agency determines that its action will have no effect, consultation is not required. 50 C.F.R. § 402.14. If it finds its proposed action may affect a listed species or critical habitat, it must formally or informally consult with, in this ease, the United States Fish and Wildlife Service (“Service”). American Rivers, 126 F.3d at 1122.
If the acting agency or consulting agency determines that the proposed action is likely to adversely affect a listed species or critical habitat, it must engage in a formal consultation. 50 C.F.R. §§ 402.13, 402.14. In a formal consultation, the consulting agency (the Service) issues a biological opinion stating whether the action is likely to jeopardize such species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. If it finds jeopardy is likely, then the acting agency (the Bureau) may suggest reasonable and prudent alternatives to be employed in order to ensure that the listed species or critical habitat is not put in jeopardy. 16 U.S.C. § 1536(b). The requirements to engage in consultation only apply to agency actions “in which there is discretionary Federal involvement or control.” 50 C.F.R. § 402.03.
C. Procedural History
In 2003, the Bureau prepared a biological assessment regarding the affect that the contract renewals would impose on the delta smelt and also requested a consultation with the Service. The Service prepared a biological opinion (“2004 opinion”) addressing whether the contract renewals would likely adversely affect a listed species or critical habitat. The Service stated in its 2004 opinion that the Bureau’s proposed action was not likely to threaten the delta smelt. Shortly thereafter, because of an intervening court decision, the Service issued a new biological opinion in 2005 (“2005 opinion”) which reached the same conclusion.
As the Service’s opinions were issued, the contracts at issue in this case had expired or were nearing expiration. Because the Bureau and the Service determined that the contract renewals would not adversely affect the delta smelt, in 2004 and 2005 the Bureau renewed 28 contracts with the Settlement Contractors not to exceed 40-years and 13 contracts with the DMC Contractors for 25-year terms.
In 2005, plaintiffs in the instant case filed suit against the government alleging that it violated § 7 of the ESA based on the Service’s 2004 opinion. The Service then issued its new 2005 opinion and plaintiffs filed another complaint referring to the 2005 opinion. In reviewing the 2005 opinion, the district court held that it was unlawful because it failed to adequately consider the impacts to the delta smelt’s critical habitat, did not rely on the best available scientific information, and did not include mandatory mitigation measures to protect the delta smelt. The district court remanded the 2005 opinion without vacatur *1097 and ordered the Bureau and the Service to reconsult on the effects of the CVP and SWP operation on the delta smelt. On December 14, 2007, interim measures were imposed by the court and were set to expire automatically on the issuance of a new biological opinion by the Service. A new opinion was filed by the Service in December 2008.
Plaintiffs filed another complaint against the government arguing that the Bureau had violated its legal obligations under § 7(a)(2) of the ESA by renewing the DMC contracts and Settlement Contracts. Each party then moved for summary judgment. The district court granted summary judgment for defendants, finding that plaintiffs lacked standing to challenge the DMC contracts and that the plaintiffs’ claims against the Settlement Contractors failed because the contracts were not discretionary and were thus exempted from § 7(a)(2) compliance.
In 2008, the Bureau completed a new biological assessment and the Service issued a new biological opinion (“2008 opinion”). In that opinion, the Service found that the CVP and SWP operations were likely to threaten the delta smelt and identified “reasonable and prudent alternatives” to avoid such jeopardy.
II. ANALYSIS
A. Standard op Review
This court reviews a district court’s grant of summary judgment de novo. Butte Envtl. Council v. U.S. Army Corps of Engineers, 620 F.3d 936, 945 (9th Cir.2010). “Mootness, a question of law, is reviewed de novo.” Tinoqiá-Chalola Council of Kitanemuk and Yowlumne Tejon Indians v. U.S. Dep’t of Energy, 232 F.3d 1300, 1303 (9th Cir.2000). Standing to challenge renewal of the DMC contracts is a legal question also reviewed de novo. Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1224-25 (9th Cir.2008).
B. Mootness
Federal defendants and DMC Contractors argue that the issuance of the 2008 opinion by the Service eliminates the “case or controversy” requirement for federal jurisdiction and makes this appeal moot. A federal court’s jurisdiction is limited to cases or controversies. U.S. Const., Art. III, § 2; Powell v. McCormack, 395 U.S. 486, 496 n. 7, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). Federal courts do not have jurisdiction to review a case when no case or controversy exists. Foster v. Carson, 347 F.3d 742, 745 (9th Cir.2003). Issuance of a superceding biological opinion moots a legal challenge to a prior biological opinion. Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1096 (9th Cir.2003); American Rivers, 126 F.3d at 1123-24; Idaho Dep’t of Fish & Game v. Nat'l Marine Fisheries Serv., 56 F.3d 1071, 1074 (9th Cir.1995).
In this case, the issues before the court are not moot because although a new 2008 opinion was issued, parts of that 2008 opinion have been held unlawful by the district court in San Luis & Delta-Mendota Water Authority v. Salazar, 760 F.Supp.2d 855 (E.D.Cal.2010) (holding that the Service’s reliance on raw salvage numbers to set river flow limits violated ESA and that its conclusion that projects contributed to impacts on predation and microcystis on delta smelt was arbitrary and capricious). Unlike previous cases that this court has addressed where a new superceding opinion clearly replaced the old opinion, in this case we have ongoing litigation regarding the validity of the 2008 opinion and a federal court which has held that parts of the 2008 opinion violate the ESA. Moreover, it is unclear whether the 2008 opinion specifically considered the im *1098 pact of the forty-one contracts on CVP operation. Because the 2008 opinion has been held, in part, unlawful, and it is unclear if the contracts at issue were considered in that opinion, this case is not moot on appeal.
C. Standing
Plaintiffs argue that the district court erred in holding that they did not have standing to challenge the DMC contracts. To invoke the jurisdiction of the federal courts, a plaintiff must have Article III standing. Salmon Spawning & Recovery Alliance, 545 F.3d at 1224-25. To establish Article III standing, a plaintiff must show that: “(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision.” Id. at 1225. If a plaintiff asserts a procedural injury, he must show that the procedures are designed to protect a concrete threatened interest and, once shown, his burden for showing causation and redressability is lessened. Id. at 1226. In that case, plaintiffs “must show only that they have a procedural right that, if exercised, could protect their concrete interests.” Id. (quoting Defenders of Wildlife v. U.S. E.P.A., 420 F.3d 946, 957 (9th Cir.2005), overruled on other grounds by Nat’l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007)).
In this case, the district court properly held that plaintiffs do not have standing to challenge the DMC contracts. Plaintiffs’ assertion that the DMC contracts are based on an improper biological opinion is an assertion of a procedural violation. See Defenders of Wildlife, 420 F.3d at 957 (claim asserting an inadequate consultation between the Environmental Protection Agency and Fish and Wildlife Service asserts a procedural violation). Plaintiffs satisfy the injury-in-fact requirement by their assertion that they believe that the Bureau has overcommitted water under the contracts which will harm the delta smelt. See Salmon Spawning & Recovery Alliance, 545 F.3d at 1225-26. However, plaintiffs fail to establish a causal connection between the threatened injury and the Bureau’s action because the DMC contracts include a shortage provision. The shortage provision expressly allows the Bureau to take any action to meet its legal obligations, which includes not delivering water to DMC Contractors if it is necessary in order to comply with § 7(a)(2) of the ESA. The DMC contract terms, therefore, expressly require that water delivery be subject to the requirements of Federal law and that the Bureau may discontinue or reduce the quantity of water delivered to the DMC Contractors. The threatened injury, i.e., jeopardy to the delta smelt, would not be traceable to the contract renewals because such contracts expressly allow for § 7(a)(2) compliance. With no threatened injury there is nothing to redress. Even under a substantive claim analysis for standing, which imposes a higher burden than a procedural analysis, plaintiffs’ claim fails because they cannot show causation. See Warth v. Seldin, 422 U.S. 490, 506-08, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (facts asserted failed to show causation for Article III standing). Thus, the district court properly determined that plaintiffs lack standing to challenge the DMC contracts under both a procedural and a substantive claim analysis.
D. Non-Discretionary Contracts
Plaintiffs argue that the district court erred in holding that their claims as to the Settlement Contracts fail because those contracts do not require compliance with § 7(a)(2) of the ESA. Section 7(a)(2) *1099 of the ESA only applies to federal agency action “in which there is discretionary Federal involvement or control.” Nat’l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 666, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (“Home Builders ”) (quoting 50 C.F.R. § 402.03). In Home Builders, the Supreme Court held § 7 did not apply to the Environmental Protection Agency’s (“EPA”) approval of an application for Arizona to administer a program under the Clean Water Act because this was not a discretionary act of the agency. Id. at 666-67, 127 S.Ct. 2518. The salient provisions of the Clean Water Act mandated that the EPA approve the application once nine statutory criteria under 33 U.S.C. § 1342(b) were met. Id. If the nine criteria were met, the EPA lacked discretion to deny the application, regardless of § 7(a)(2) requirements. Id. Because the EPA’s discretion was so limited in determining whether to approve the applications, it did not trigger the requirements under § 7(a)(2) of the ESA. Id. at 673, 127 S.Ct. 2518. The Court stated that “[a]s the mandatory language of [50 C.F.R.] § 402(b) itself illustrates, not every action authorized, funded, or carried out by a federal agency is a product of that agency’s exercise of discretion.” Id. at 668, 127 S.Ct. 2518.
In this case, the district court properly held that the Bureau’s renewal of the Settlement Contracts is not subject to § 7(a)(2) of the ESA because its action is not a “discretionary action.” Under § 8 of the Reclamation Act of 1902, the Bureau must operate the CVP in conformity with California water law on the “control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder.” 43 U.S.C. § 383; California v. United States, 438 U.S. 645, 675-79, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978) (holding that California may impose conditions on permits granted to the United States for CVP operation). Section 8 includes the “full recognition” of any “vested right acquired” under California water law. 43 U.S.C. § 383; United States v. Gerlach Live Stock Co., 339 U.S. 725, 734, 70 S.Ct. 955, 94 L.Ed. 1231 (1950). Under California law, senior appropriative water rights must be satisfied before junior water rights. Pasadena v. Alhambra, 33 Cal.2d 908, 926, 207 P.2d 17 (1949). The Central Valley Project Improvement Act (“CVPIA”), Pub.L. 102-575, 106 Stat. 4714 (1992), requires the Bureau to operate the CVP in compliance with “all decisions of the California Water Resources Control Board.” CVPIA § 3406(a). The California Water Resources Control Board issued Decision 990 in which it agreed to grant the Bureau rights to operate the CVP only if it addressed the issue of those claiming to hold senior water rights. Under the Settlement Contracts, negotiated at the behest of the California Water Resources Control Board, the Bureau is required to deliver base supply water for free and that the supply may only be reduced by 25% in critically dry years. The duty to deliver the base supply water is mandatory. Under the contracts, the contractors are entitled to 100% of their base water, which can only be reduced by 25% in very dry years. Under the CVPIA, the Bureau is required to renew these contracts wpon request. See CVPIA § 3404(c).
Here, the Bureau’s discretion is limited with regard to the Settlement Contracts so that § 7(a)(2) of the ESA is not triggered. The Bureau’s hands are tied historically by those asserting senior water rights in the CVP. The Bureau was required to acknowledge such rights in order to operate the CVP, which it did by entering the Settlement Contracts. We agree with the district court, which held
Plaintiffs’ claims fail as to the [Settlement Contracts] because [the Bureau’s] discretion is substantially constrained by prior contract. Therefore, following the Supreme Court’s decision in Home *1100 Builders, [551 U.S. 644, 127 S.Ct. 2518], Section 7(a)(2) of the ESA does not apply to the [Settlement] Contract renewal process. Specifically, Article 9(a) of the [Settlement] Contracts requires [the Bureau] to renew these contracts for the same quantity of water, the same allocation of water between base supply and project water, and the same place of use on specifically designated land as the original contracts. By executing the original [Settlement] Contracts, [the Bureau] surrendered its power to change these terms. Article 9(a) of the [Settlement] Contracts provides for the exact definition of water rights achieved in the original [Settlement] Contracts to be preserved upon renewal. This substantially constrains [the Bureau’s] discretion to reduce diversions of Sacramento River System water for the benefit of the Delta smelt or any other reason, by fixing [Settlement] Contractor quantities, allocations, and places of use upon renewal.
Natural Res. Def. Council v. Kempthorne, No. 1:05-ev-1207, 2009 WL 1575208, at *2 (E.D.Cal. June 3, 2009).
III. CONCLUSION
We hold that the district court properly granted summary judgment for defendants, finding that plaintiffs lack standing with regard to the DMC contracts and that § 7(a)(2) of the ESA does not apply to the Settlement Contracts.
AFFIRMED.