# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SALMON SPAWNING & RECOVERY
ALLIANCE; NATIVE FISH SOCIETY;
CLARK-SKAMANIA FLYFISHERS,
          *Plaintiffs-Appellants,*

                v.

CARLOS M. GUTIERREZ, in his
official capacity; UNITED STATES
DEPARTMENT OF COMMERCE; D.
ROBERT LOHN, in his official
capacity; NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION
NATIONAL MARINE FISHERIES
SERVICE; CONDOLEEZZA RICE, in her
official capacity; UNITED STATES
DEPARTMENT OF STATE,
              *Defendants-Appellees.*

No. 06-35979

D.C. No.
CV-05-01877-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
April 11, 2008—Seattle, Washington

Filed October 8, 2008

Before: A. Wallace Tashima, M. Margaret McKeown, and
William A. Fletcher, Circuit Judges.

Opinion by Judge McKeown

14321

**COUNSEL**

Eric Redman, Svend A. Brandt-Erichsen, Kelly B. Fennerty, Heller Ehrman LLP, Seattle, Washington, for the plaintiffs-appellants.

Matthew J. McKeown, Acting Assistant Attorney General, Coby Howell, Ellen Durkee, Mark Haag, Environmental & Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendants-appellees.

## OPINION

McKEOWN, Circuit Judge:

Wild salmon and steelhead, which are listed as threatened or endangered under the Endangered Species Act, have been the subject of much litigation in the federal courts. As they swim back and forth from the Pacific Northwest to Canada, the fish have no cognizance of an international boundary, or the Pacific Salmon Treaty of 1999 ("Treaty"), an effort by Canada and the United States to manage salmon populations originating in Alaska and the Pacific Northwest.

This appeal concerns whether three conservation groups have standing to challenge the decision of federal agencies and officials to enter into, and remain a party to, that Treaty. The groups alleged that take levels permitted under the Treaty have allowed Canadian fisheries to overharvest endangered and threatened salmon and steelhead. The district court dismissed all three of their claims for lack of standing. We reverse the district court in part because the groups have procedural standing to bring their third claim for relief. We affirm the dismissal of the first and second claims.

### BACKGROUND

At the heart of this case are chinook and coho salmon and steelhead trout populations from Puget Sound, lower Columbia River, and Snake River (collectively, "salmon"). Twenty-six populations of these salmon are listed as threatened or endangered under the Endangered Species Act, 16 U.S.C.

§ 1531 *et seq.* ("ESA"). During their lifetime, these fish swim northward toward waters off the coast of British Columbia and Alaska, and then journey back through Alaskan and Canadian waters to return to their rivers of origin, where they spawn and die. Because of these unusual transboundary migration patterns, ESA-listed salmon that originate in United States waters are often caught by commercial and recreational fishers in Canada before they can make it back to their rivers of origin.

In 1985, Canada and the United States entered into the Pacific Salmon Treaty to manage salmon populations originating in Alaska, Canada, and the Pacific Northwest. That version of the Treaty set harvest ceilings for fisheries in both countries. Those ceilings remained constant from year to year. The ceilings initially proved successful at increasing salmon survival, but a drought in the early 1990s and poor survival conditions reversed that effect. In 1992, the Treaty expired. Unable to work out another agreement, the United States and Canada went back to managing their respective fisheries independently.

In 1999, the two countries entered into another Treaty, which is at the heart of this litigation. In contrast to the 1985 version, a portion of the 1999 Treaty established annual abundance-based chinook management regimes for fisheries off the coast of Southeast Alaska, Canada, Washington, and Oregon. Because Canadian, or "northern," fisheries harvest listed salmon in substantially greater numbers than the United States, or "southern," fisheries, the Treaty provisions focus mostly on the take levels of Canadian fisheries. Rather than setting absolute harvest ceilings that remain unchanged from year to year, the 1999 Treaty sets annual chinook harvest limits based on pre- and in-season estimates of abundance.

The Treaty is implemented through the Pacific Salmon Commission ("Commission"). The Commission collects data on harvest from the two countries, and then recommends fish-

ery management regimes. The Secretary of State of the United States, in consultation with the Secretary of Commerce and the Secretary of the Interior, approves or disapproves regimes that are recommended by the Commission. 16 U.S.C. § 3633(a)(2). Only those fishery regimes that are approved by the Secretary of State under subsection (a)(2) are forwarded to the states and tribes for implementation. *Id.* § 3633(b). The Treaty provisions will expire at the end of 2008, unless the United States and Canada agree to an extension or modification.

The United States' implementation of the Treaty provisions was conditioned on its compliance with the requirements of the ESA. Under § 7(a)(2), 16 U.S.C. § 1536(a)(2), federal agencies must consult with either the National Marine Fisheries Service ("NMFS") or the Fish and Wildlife Service ("FWS") to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." Formal consultation begins with a written request by the agency planning to take action ("action agency"), and concludes with the issuance of a biological opinion ("BiOp") by either NMFS or FWS as the "consulting agency." 50 C.F.R. § 402.14(c), (l)(1). NMFS or FWS opines in the BiOp whether the proposed action, taken together with its cumulative effects, is likely to jeopardize the continued existence of listed species. *Id.* § 402.14(g)(4).

If an action is likely to jeopardize a species, the action agency must determine whether any "reasonable and prudent alternatives" ("RPA") exist that will avoid jeopardizing threatened species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). If the BiOp results in a "no jeopardy" finding, or an RPA is available, NMFS or FWS will issue an "incidental take statement" with the BiOp that exempts the action agency, and those authorized by it, from the taking prohibition of ESA § 9, 16 U.S.C. § 1536(b)(4).

The agency action triggering the ESA § 7 consultation process in this case was the State Department's decision to enter into the 1999 Treaty on behalf of the United States. In effect, NMFS, as the consulting agency, studied whether Canadian take under the levels permitted by the Treaty would jeopardize listed salmon. NMFS issued a BiOp in which it concluded that Canadian take under the Treaty was not likely to jeopardize the continued existence of threatened or endangered salmon stocks. Because NMFS made a "no jeopardy" determination, it had no obligation to identify any alternatives. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14. NMFS included an incidental take statement to exempt the agencies from liability under ESA § 9.

In November 2005, three conservation groups—Salmon Spawning & Recovery Alliance, Native Fish Society, and Clark-Skamania Flyfishers[1] (collectively "Salmon Spawning")—filed this action. Salmon Spawning alleged that the Department of Commerce, NMFS, the State Department, and the heads of those agencies in their official capacities, violated their obligations under ESA §§ 7, 9, and 10, and §§ 702 and 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 and 706. The conservation groups challenged the BiOp as flawed, alleged that the federal agencies and officials violated their substantive duties under the ESA by continuing to implement the Treaty provisions, and claimed that formal consultation needed to be reinitiated in light of new information about listed salmon. The groups noted that in 2005, NMFS issued a BiOp in which it acknowledged that the Canadian harvest of Nooksack River chinook

---

[1]Salmon Spawning & Recovery Alliance is a Washington-based group "dedicated to aiding the recovery of threatened and endangered salmon populations in the Northwest . . . ." Compl. ¶ 3. Native Fish Society is an Oregon non-profit corporation "dedicated to the protection and recovery of native fishes and their habitats in the Northwestern United States[.]" *Id.* ¶ 4. Clark-Skamania Flyfishers is a Washington non-profit corporation "dedicated to the preservation of wild fish stocks, including ESA-listed salmon and steelhead, and the natural resources that sustain them." *Id.* ¶ 5.

is above the rate necessary to rebuild the population. NMFS also noted in the 2005 BiOp that harvest rates by United States and Canadian fisheries of Pacific Northwest chinook from populations other than those at issue were too high to allow these populations to recover.

The agencies and officials moved to dismiss the complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, for failure to state a claim under Rule 12(b)(6). The district court ultimately dismissed the complaint for lack of standing under Article III, concluding that Salmon Spawning failed to show causation and redressibility. According to the court, the cause of the excessive harvesting was Canadian fishermen, and redress was speculative because the court could not direct the State Department to renegotiate the Treaty with Canada. Standing is a question of law that we review de novo. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003).

## ANALYSIS

The broad contours of Article III standing are well known. We must first decide whether a plaintiff has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III. *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). The plaintiff has the burden of establishing the three elements of Article III standing: (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Statutory standing is the second part of the inquiry. *Cetacean Cmty.*, 386 F.3d at 1175. If a plaintiff has shown sufficient injury to satisfy Article III, but has not been granted

statutory standing, the suit must be dismissed under Federal Rule of Civil Procedure 12(b)(6), because the plaintiff cannot state a claim upon which relief can be granted. *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 n.7 (9th Cir. 2008) (citing *Cetacean Cmty.*, 386 F.3d at 1175).

## I.   ALLEGED LEGAL INADEQUACY OF THE BIOP

In the first claim for relief, Salmon Spawning alleged that the 1999 BiOp authorizing the United States' entry into the Treaty was arbitrary and capricious in violation of § 5 of the APA, and also a violation of ESA §§ 7 and 9. Specifically, the groups claimed that the BiOp improperly compared only the Treaty's effect on harvest rates to harvest rates in the absence of the Treaty, instead of aggregating the effects of take under the Treaty, other harvest impacts, and non-harvest impacts; failed to evaluate the effects of take under the Treaty on the recovery and survival of listed salmon; evaluated only a fraction of the Puget Sound chinook populations; did not develop or apply a biologically based target exploitation rate in its jeopardy evaluation of Upper Willamette chinook; studied harvest impacts on the strongest components of the Lower Columbia chinook population, but not the weaker ones; and failed to analyze or propose reasonable and prudent measures or alternatives that would force the fisheries to target more selectively hatchery-origin salmon.[2] In short, the conservationists challenge the biological foundation for the Treaty.

[1] To satisfy the injury-in-fact requirement of the Article III inquiry, "a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect

---

[2]Many salmon that are born in hatcheries have their adipose fin clipped prior to their release into the ocean. NMFS recently adopted regulations to prohibit the take of non-hatchery salmon, i.e., those with an intact adipose fin. 50 C.F.R. § 223.203. The groups point out this distinction between hatchery-origin and non-hatchery origin salmon to suggest the ease with which NMFS could implement measures to limit the take of non-hatchery salmon.

some threatened concrete interest of his that is the ultimate basis of his standing." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003) (quoting *Public Citizen v. Dep't of Transp.*, 316 F.3d 1002, 1015 (9th Cir. 2003), *rev'd on other grounds*, 541 U.S. 752 (2004) (quoting *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001))). The conservation groups alleged in their complaint that they have various "scientific, educational, aesthetic, recreational, spiritual, conservation, economic, and business interests" in the salmon. The § 7 consultation procedures in question—for example, the requirements that the BiOp evaluate both the recovery and survival of listed species, and that RPA or reasonable and prudent measures are proposed—protect these concrete interests. *See* 50 C.F.R. § 402.02 (defining, for purposes of ESA § 7(a)(2), to "jeopardize the continued existence" of a listed species); 16 U.S.C. § 1536(b)(3)(A) (requiring the proposal of RPA if jeopardy is found). These procedures are designed to advance the ESA's overall goal of species preservation, and thus the groups' specific goals as to salmon preservation, by ensuring agency compliance with the ESA's substantive provisions. *See Bennett*, 520 U.S. at 176.

**[2]** A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility. *See Lujan*, 504 U.S. at 572 n.7 (stating that the "person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressibility and immediacy."). Plaintiffs alleging procedural injury "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis in original), *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S.Ct. 2518 (2007). It is at this step of the standing analysis that the conservation groups stumble.

The BiOp considered two proposed agency actions, only one of which is at issue in this appeal: the "formal commitment of the U.S. to implement its fishery obligations consistent with, and for the duration of, the new PST agreement— essentially a final U.S. approval of the agreement."[3] The BiOp recognized that, once the United States entered into the Treaty, "fishing levels in Canada will be set by the provisions of the agreement for its duration, and *cannot be re-visited except as may otherwise be agreed by both countries.*" (emphasis added).

**[3]** The relationship between the BiOp and the Treaty sets up a dichotomy of interests that sinks the effort to establish Article III standing for the first two claims; if the groups were successful in establishing that NMFS failed to comply with the procedural requirements of ESA § 7 in deciding whether the United States' entrance into the Treaty would jeopardize listed species, the procedurally flawed consultation and defective BiOp could theoretically be set aside. *See* 5 U.S.C. § 706. But, a court could not set aside the next, and more significant, link in the chain—the United States' entrance into the Treaty. While the United States and Canada can decide to withdraw from the Treaty, that is a decision committed to the Executive Branch, and we may not order the State Department to withdraw from it. *See Earth Island Inst. v. Christopher*, 6 F.3d 648, 652-53 (9th Cir. 1993) (deciding not to enforce a statute that required the Executive Branch to negotiate with foreign nations, as that branch alone has the exclusive power to conduct foreign relations). So, while the groups correctly allege that they have a right to a procedurally sound consultation, they cannot demonstrate that "that right, if exercised, *could* protect their concrete interests." *Defenders of Wildlife*, 420 F.3d at 957.

---

[3]The other agency action that was examined by the BiOp was the decision by the North Pacific Fisheries Management Council to continue to defer its management authority to the State of Alaska.

Plaintiffs alleging procedural injury can often establish redressibility with little difficulty, because they need to show only that the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision of whether to take or refrain from taking a certain action. *See, e.g.*, *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 779 (9th Cir. 2006). This is not a high bar to meet. But, the redressibility requirement is not toothless in procedural injury cases. Here, if a court were to give the groups the remedy that they seek—that NMFS and the State Department follow the proper procedures during a new § 7 consultation process—the ultimate agency decision of whether to enter into the Treaty with Canada, made nine years ago, could never be influenced. In effect, if we rule against the groups' claim of procedural injury, they will continue to suffer injury; and, if we rule in their favor, they will still suffer injury because we cannot undo the Treaty. *Cf. id.* That the BiOp authorized the United States to enter into a Treaty with a foreign sovereign "foreclose[s] our ability to provide effective relief." *Id.*

**[4]** Perhaps recognizing their redressibility quandary, the conservation groups assert that the BiOp authorized agency actions broader than the State Department's entrance into the Treaty.[4] But, this semantic attempt to turn the BiOp into a freestanding basis for relief fails. The agency action that the BiOp authorized was the United States' entrance into the Treaty. And, although we can set aside the BiOp, we cannot remedy the harm asserted. We affirm the district court's dismissal of the first claim for lack of standing.

---

[4]For example, the groups suggest that the BiOp authorized the federal agencies to seek out and implement additional conservation measures, required them to monitor Treaty fisheries, and assigned them ongoing roles in implementing the Treaties.

## II. THE AGENCIES' CONTINUED IMPLEMENTATION OF THE TREATY

**[5]** In its second claim for relief, Salmon Spawning asserted that the agencies' and officials' continued participation in the implementation of the Treaty jeopardized listed salmon in violation of ESA § 7(a)(2), and that such participation was arbitrary and capricious in violation of the APA. Section 7(a)(2) confers upon agencies that are considering discretionary actions an affirmative "do-no-harm obligation" when their actions could cause harm to an endangered species. *Defenders of Wildlife*, 420 F.3d at 965. This duty is separate from an agency's responsibility to comply with the procedures required by § 7. *See id.* at 957 (noting that a plaintiff may allege both procedural and substantive violations of the ESA). In other words, even if an action agency has satisfied the ESA's consultation requirements, a court may conclude that the agency has not complied with its substantive duty to avoid jeopardy. *Id.* So, in contrast to its first claim, which focused on alleged procedural flaws that occurred during the pre-Treaty consultation process, Salmon Spawning's second claim challenges the agencies' decision to continue allowing excessive Canadian harvesting now that the United States is a party to the Treaty.

Even assuming that Salmon Spawning meets the injury-in-fact requirement—by asserting that its scientific, educational, aesthetic, recreational, economic, and business interests in the listed species will continue to be harmed by the failure to correct overharvesting by the Canadians—a more difficult question is whether the groups have established causation and redressibility with respect to this claim. To show causation, the plaintiff must demonstrate a "causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560-61 (quot-

ing *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976) (internal quotation marks omitted)).

**[6]** In the complaint, Salmon Spawning alleged that the groups' injury is caused by the United States' continued implementation of the Treaty, without exercising the authority to withdraw from the Treaty or requesting additional conservation measures to benefit listed salmon. On these allegations alone, the district court properly concluded that causation was lacking. The excessive harvesting permitted under the Treaty is not fairly traceable to the United States' failure to withdraw from the Treaty. If the United States withdrew, the harvesting of listed species would arguably increase, because the Treaty set abundance-based limits on the Canadians' take. The over-harvesting is also not fairly traceable to the agencies' failure to ask the Canadians to take additional conservation measures. Although the Canadians, if asked, might agree to require a reduction in their fisheries' take, they could also refuse to accommodate the United States' request. If we consider only these grounds as the bases for establishing causation, the "causal connection" put forward by the conservation groups relies on an "attenuated chain of conjecture" insufficient to support standing. *See Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000).

But, on appeal, the groups have focused on a different ground to illustrate their injury: the ability of the federal agencies to limit the take of United States fisheries.[5] They argue that because the agencies can limit the take of United States

---

[5]The groups admitted at oral argument that they migrated from their focus in district court on reducing the take of Canadian fisheries, to a position that United States fisheries should reduce their take and thus offset the Canadians' take. A plaintiff's basis for standing must "affirmatively appear in the record." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 (1986). The allegation in the complaint that the defendants failed to "request additional conservation measures to benefit ESA-listed salmon populations" is marginally broad enough to include measures that could be taken by either Canada or the United States.

fisheries and thus offset the effects of Canadian harvesting, the failure to take such action while permitting Canadian overharvesting under the Treaty violates the ESA.

Though we are dubious about this proposition for purposes of causation and we are not inclined to read the complaint so broadly as to encompass an entirely new theory of causation, even if we were to credit this argument, redressibility poses an upstream battle. Salmon Spawning argues that a court order declaring that the agencies and officials violated the ESA and APA would require the defendants to exercise their authority to reduce the take of United States fisheries. We are not persuaded. According to Salmon Spawning, if we declared that the agencies violated their ESA obligation to avoid jeopardy, that would leave it "up to Defendants to determine whether . . . negotiations with Canada—or changes in U.S. fisheries—are needed to meet their obligations under the ESA." This argument highlights the key difference between asserting substantive and procedural violations of the ESA: a plaintiff alleging procedural violations of the ESA must show only that the procedural right could protect their interest, whereas a plaintiff alleging a substantive violation must demonstrate that its injury would likely be redressed by a favorable court decision.

**[7]** For much the same reason as the first claim fails, this claim hinges on agency action vis-a-vis the Treaty. The court cannot order renegotiation of the Treaty, and discretionary efforts by the agencies are too uncertain to establish redressibility. That a favorable judicial decision would leave matters to the discretion of the State Department and NMFS makes equally likely the possibility that the agencies would decide to take no "agency action" with respect to Canada's fisheries —so as not to be constricted by § 7's "no jeopardy" requirement—as the possibility that they would renegotiate a Treaty that would more aggressively limit the Canadians' take. Because Salmon Spawning has failed to show redressi-

bility, we affirm the district court's dismissal of the second claim for relief.

## III.   THE AGENCIES' FAILURE TO REINITIATE CONSULTATION

[8] Salmon Spawning also alleged that the State Department and NMFS were obligated by ESA § 7 and its implementing regulations to reinitiate consultation on the 1999 BiOp. Consultation under § 7 must be reinitiated where (a) discretionary federal involvement or control has been retained or authorized; and (b) the amount or extent of taking specified is exceeded, new information reveals effects that may affect listed species or critical habitat in a manner not considered, the action is subsequently modified so as to cause an effect to the listed species or critical habitat not previously considered, or a new species is listed or critical habitat designated. 50 C.F.R. § 402.16. The duty to reinitiate consultation lies with both the action agency and the consulting agency. *See id.*

[9] According to Salmon Spawning, since the BiOp was issued in 1999, new criteria developed by NMFS show that the Canadian harvest is taking more Puget Sound chinook than the BiOp anticipated; new data shows the amount and extent of the Canadian harvest of ESA-listed salmon; NMFS has changed the definition of salmon evolutionary significant units since 1999, such that almost three quarters of the salmon caught in some Canadian fisheries are ESA-listed; and it is now possible to differentiate between hatchery-origin salmon and listed salmon.

[10] These claims alleged sufficient injury to satisfy the "case or controversy" requirement of Article III. With respect to injury in fact, Salmon Spawning claims that the State Department and NMFS violated the procedural requirements of § 7 by failing to reinitiate consultation in light of new information. The requirement that consultation be reinitiated protects a "concrete threatened interest" that is the basis of

Salmon Spawning's standing, the avoidance of harm to listed species. *Citizens for Better Forestry*, 341 F.3d at 969-70.

Because Salmon Spawning has properly alleged procedural injury, as noted earlier, causation and redressibility are relaxed. *Lujan*, 504 U.S. at 572 n.7. That it is uncertain whether reinitiation will ultimately benefit the groups (for example, by resulting in a "jeopardy" determination) does not undermine their standing. *Cantrell*, 241 F.3d at 682. The asserted injury is not too tenuously connected to the agencies' failure to reinitiate consultation. And a court order requiring the agencies to reinitiate consultation would remedy the harm asserted. Unlike the other claims, this claim is a forward-looking allegation whose remedy rests in the hands of federal officials and does not hinge on upsetting the Treaty.

[11] Salmon Spawning also meets the requirements for statutory standing under the ESA and the APA. The ESA's citizen-suit provision authorizes the groups to bring suit against the State Department, as the action agency, for failure to comply with its ESA obligations. 16 U.S.C. § 1540(g)(1)(A). As for standing under the APA, the failure to reinitiate § 7 consultation is a final agency action subject to judicial review. *See Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1079 (9th Cir. 2001). The conservation groups' interests in the protection of listed salmon are within the zone of interests to be protected by the ESA regulation requiring reinitiation. *See id.*

[12] Finally, Salmon Spawning has established associational standing. *Public Citizen*, 316 F.3d at 1019. Each of the conservation groups' members has standing to sue individually; the interests the groups seek to protect are germane to their purposes as conservation organizations; and neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. *Id.* Therefore, we reverse the district court's dismissal of Salmon Spawn-

ing's third claim for lack of standing and remand for further proceedings.[6]

The judgment of the district court is affirmed in part, reversed in part, and remanded. We remand to the district court to determine whether attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, should be granted. Each party shall pay its own costs on appeal.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[6]The agencies and officials moved to dismiss in the alternative for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because the motion to dismiss targeted standing, Salmon Spawning did not focus on this argument below, nor did the district court rule on it. This issue was not briefed on appeal. Therefore, we decline to pass on the merits of the motion to dismiss and remand to the district court for further proceedings. We offer no opinion whether Salmon Spawning has stated a claim for relief.