**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NATURAL RESOURCES DEFENSE
COUNCIL; CALIFORNIA TROUT;
BAYKEEPER & IT'S DELTAKEEPER
CHAPTER; FRIENDS OF THE RIVER;
THE BAY INSTITUTE, all non-profit
organizations,

> *Plaintiffs-Appellants,*

and

METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA, Plaintiff in
Related Case,

> *Plaintiff,*

v.

KENNETH LEE SALAZAR, in his
official capacity as Secretary of
the Interior; SAM D. HAMILTON, in
his official capacity as Director of
the U.S. Fish and Wildlife
Service; MICHAEL J. CONNOR, in
his official capacity as
Commissioner of the U.S. Bureau
of Reclamation; ANDERSON-
COTTONWOOD IRRIGATION DISTRICT;
PACIFIC REALTY ASSOCIATES, LP;
RECLAMATION DISTRICT 1004;

Beverly F. Andreotti; Banta-
Carbona Irrigation District;
Patterson Irrigation District;
West Side Irrigation District;
Byron Bethany Irrigation
District; Carter Mutual Water
Company; Howald Farms, Inc.;
Maxwell Irrigation District;
Meridian Farms Water Company;
Oji Brothers Farm, Inc.; Henry
D. Richter; Sutter Mutual
Water Co.; Tisdale
Irrigation and Drainage
Company; Windswept Land and
Livestock Company; City of
Redding; Coelho Family Trust;
Eagle Field Water District;
Mercy Springs Water District;
Oro Loma Water District;
Conaway Conservancy Group;
Del Puerto Water District;
West Stanislaus Irrigation
District; Fresno Slough Water
District; James Irrigation
District; Tranquility Irrigation
District; Christo D. Bardis;
Abdul Rauf; Tahmina Rauf;
Sacramento River Ranch, LLC;
Fred Tenhunfeld; Family Farm
Alliance,
                    *Defendants-Appellees,*

San Luis & Delta-Mendota
Water Authority; Westlands
Water District; California Farm
Bureau Federation; State Water
Contractors; California
Department of Water Resources;
Glenn-Colusa Irrigation
District; Natomas Central
Mutual Water Company; Pelger
Mutual Water Company;
Pleasant Grove-Verona Mutual
Water Company; Reclamation
District 108; River Garden
Farms; Princeton-Codora-Glenn
Irrigation District; Provident
Irrigation District; Kern County
Water Agency,
   *Defendant-intervenors-Appellees.*

No. 09-17661
D.C. No.
1:05-cv-01207-
OWW- GSA
OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, Senior District Judge, Presiding

Argued and Submitted
May 9, 2011—San Francisco, California

Filed July 17, 2012

Before: Procter Hug, Jr. and Richard A. Paez,
Circuit Judges, and Liam O'Grady, District Judge.*

*The Honorable Liam O'Grady, District Judge for the U.S. District
Court for Eastern Virginia, Alexandria, sitting by designation.

Opinion by Judge Hug;
Dissent by Judge Paez

## COUNSEL

Katherine Poole, Senior Attorney, Natural Resources Defense
Council, San Francisco, California; Hamilton Candee and

Barbara J. Chisholm, Altshuler Berzon LLP, for the plaintiffs-appellants.

Andrew C. Mergen and Robert H. Oakley, Attorneys, Environment & Natural Resources Division, Department of Justice, Washington, D.C., for the defendants-appellees.

Daniel J. O'Hanlon, Kronick Moskovitz Tiedemann & Girard, PC, Sacramento, California; Stuart L. Somach and Andrew M. Hitchings, Somach Simmons & Dunn, Sacramento, California; Steven P. Saxton, Downey Brand LLP, Sacramento, California, for the defendant-intervenors-appellees.

---

## OPINION

HUG, Circuit Judge:

In this appeal, we address whether the renewal of forty-one water supply contracts by the United States Bureau of Reclamation violates § 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2) and illegally threatens the existence of the delta smelt. We conclude that it does not, and we affirm the judgment of the district court.

## I.  BACKGROUND

### A.  FACTUAL BACKGROUND

The delta smelt is a small fish endemic to the San Joaquin and Sacramento Rivers Delta Estuary which was declared endangered by the United States Fish and Wildlife Service under the Endangered Species Act in 1993. Though previously abundant, the population of the delta smelt has diminished markedly in the last several decades. "The delta smelt presently has no commercial value, but it was commercially harvested as bait in the past." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1167 (9th Cir. 2011).

Plaintiffs, several conservation groups, argue that in 2005 the United States Bureau of Reclamation ("Bureau") renewed forty-one water service contracts with various water users without conducting an adequate consultation under § 7(a)(2) of the Endangered Species Act and that the contracts jeopardize the existence of the delta smelt. The contracts at issue fall into two groups: (1) users who obtain water from the Delta-Mendota Canal ("DMC Contractors"); and (2) parties who claim to hold water rights senior to those held by the Bureau with regard to the Central Valley Project and who previously entered into settlement contracts with the Bureau ("Settlement Contractors").

Generally, the Bureau is a federal water management agency which operates the Central Valley Project ("CVP"). The CVP is a network of dams, reservoirs, and pumping facilities which regulates the flow of water in the San Joaquin and Sacramento Rivers. California's State Water Project ("SWP") operates the same watershed as the CVP and both offices convey water by pumping water from the two rivers. The SWP consists of dams, canals, and pumping plants and is "the state analogue to the Central Valley Project." *Sierra Club v. Andrus*, 610 F.2d 581, 586 (9th Cir. 1979), *rev'd on other grounds, California v. Sierra Club*, 451 U.S. 287, 290-91 (1981).

The Bureau and SWP have coordinated management of CVP. The joint effort began in the 1930s when the Bureau assumed control of it because California could not finance the project. The Bureau had to obtain water rights under state law to operate CVP and a dispute arose regarding the priority of pre-project water rights. Under California law, a senior holder of water rights has the right "to fulfill his needs before a junior appropriator is entitled to use any water." *United States v. State Water Resources Control Bd.*, 182 Cal. App. 3d 82, 102 (Cal. Ct. App. 1986). The California Water Rights Board held hearings on the matter and issued a decision allowing the Bureau to use CVP water if it first addressed the issue of the

holders asserting senior water rights. The Board recognized that senior water rights existed, though undefined, and required a settlement.

In 1964, the Bureau and those asserting senior water rights entered into 145 settlement contracts for 40-year terms. The contracts did not resolve the seniority claims, but guaranteed Settlement Contractors a certain amount of "base water" annually without any fee and other "project water" for which they would pay a fee to receive. The "base water" could only be reduced by 25% in very dry years.

The Bureau also contracted with a coalition of water service contractors who obtained water from the Delta-Mendota Canal, the DMC Contractors. These contracts provided for water delivery to the DMC Contractors annually which the contractors paid the Bureau to receive. Like the Settlement Contracts, these contracts were also long-term water supply contracts.

## B.  Statutory Framework

The Endangered Species Act ("ESA") "has both substantive and procedural provisions designed to protect endangered species and their habitat." *American Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1121 (9th Cir. 1997). Under § 7(a)(2) of the ESA, federal agencies are required to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). An agency which proposes the action must determine whether its action may affect the listed species or critical habitat and present its conclusions in a biological assessment. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If the agency determines that its action will have no effect, consultation is not required. 50 C.F.R. § 402.14. If it finds its proposed action may affect a listed species or critical

habitat, it must formally or informally consult with, in this case, the United States Fish and Wildlife Service ("Service"). *American Rivers*, 126 F.3d at 1122.

If the acting agency or consulting agency determines that the proposed action is likely to adversely affect a listed species or critical habitat, it must engage in a formal consultation. 50 C.F.R. §§ 402.13, 402.14. In a formal consultation, the consulting agency (the Service) issues a biological opinion stating whether the action is likely to jeopardize such species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. If it finds jeopardy is likely, then the acting agency (the Bureau) may suggest reasonable and prudent alternatives to be employed in order to ensure that the listed species or critical habitat is not put in jeopardy. 16 U.S.C. § 1536(b). The requirements to engage in consultation only apply to agency actions "in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

## C. Procedural History

In 2003, the Bureau prepared a biological assessment regarding the affect that the contract renewals would impose on the delta smelt and also requested a consultation with the Service. The Service prepared a biological opinion ("2004 opinion") addressing whether the contract renewals would likely adversely affect a listed species or critical habitat. The Service stated in its 2004 opinion that the Bureau's proposed action was not likely to threaten the delta smelt. Shortly thereafter, because of an intervening court decision, the Service issued a new biological opinion in 2005 ("2005 opinion") which reached the same conclusion.

As the Service's opinions were issued, the contracts at issue in this case had expired or were nearing expiration. Because the Bureau and the Service determined that the contract renewals would not adversely affect the delta smelt, in 2004 and 2005 the Bureau renewed 28 contracts with the Settle-

ment Contractors not to exceed 40-years and 13 contracts with the DMC Contractors for 25-year terms.

In 2005, plaintiffs in the instant case filed suit against the government alleging that it violated § 7 of the ESA based on the Service's 2004 opinion. The Service then issued its new 2005 opinion and plaintiffs filed another complaint referring to the 2005 opinion. In reviewing the 2005 opinion, the district court held that it was unlawful because it failed to adequately consider the impacts to the delta smelt's critical habitat, did not rely on the best available scientific information, and did not include mandatory mitigation measures to protect the delta smelt. The district court remanded the 2005 opinion without vacatur and ordered the Bureau and the Service to reconsult on the effects of the CVP and SWP operation on the delta smelt. On December 14, 2007, interim measures were imposed by the court and were set to expire automatically on the issuance of a new biological opinion by the Service. A new opinion was filed by the Service in December 2008.

Plaintiffs filed another complaint against the government arguing that the Bureau had violated its legal obligations under § 7(a)(2) of the ESA by renewing the DMC contracts and Settlement Contracts. Each party then moved for summary judgment. The district court granted summary judgment for defendants, finding that plaintiffs lacked standing to challenge the DMC contracts and that the plaintiffs' claims against the Settlement Contractors failed because the contracts were not discretionary and were thus exempted from § 7(a)(2) compliance.

In 2008, the Bureau completed a new biological assessment and the Service issued a new biological opinion ("2008 opinion"). In that opinion, the Service found that the CVP and SWP operations were likely to threaten the delta smelt and identified "reasonable and prudent alternatives" to avoid such jeopardy.

## II.  ANALYSIS

### A.  Standard of Review

This court reviews a district court's grant of summary judgment de novo. *Butte Envtl. Council v. U.S. Army Corps of Engineers*, 620 F.3d 936, 945 (9th Cir. 2010). "Mootness, a question of law, is reviewed de novo." *Tinoqui-Chalola Council of Kitanemuk and Yowlumne Tejon Indians v. U.S. Dep't of Energy*, 232 F.3d 1300, 1303 (9th Cir. 2000). Standing to challenge renewal of the DMC contracts is a legal question also reviewed de novo. *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1224-25 (9th Cir. 2008).

### B.  Mootness

Federal defendants and DMC Contractors argue that the issuance of the 2008 opinion by the Service eliminates the "case or controversy" requirement for federal jurisdiction and makes this appeal moot. A federal court's jurisdiction is limited to cases or controversies. U.S. Const., Art. III, § 2; *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969). Federal courts do not have jurisdiction to review a case when no case or controversy exists. *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003). Issuance of a superceding biological opinion moots a legal challenge to a prior biological opinion. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1096 (9th Cir. 2003); *American Rivers*, 126 F.3d at 1123-24; *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1074 (9th Cir. 1995).

**[1]** In this case, the issues before the court are not moot because although a new 2008 opinion was issued, parts of that 2008 opinion have been held unlawful by the district court in *San Luis & Delta-Mendota Water Authority v. Salazar*, 760 F. Supp. 2d 855 (E.D. Cal. 2010) (holding that the Service's reliance on raw salvage numbers to set river flow limits violated ESA and that its conclusion that projects contributed to

impacts on predation and microcystis on delta smelt was arbitrary and capricious). Unlike previous cases that this court has addressed where a new superceding opinion clearly replaced the old opinion, in this case we have ongoing litigation regarding the validity of the 2008 opinion and a federal court which has held that parts of the 2008 opinion violate the ESA. Moreover, it is unclear whether the 2008 opinion specifically considered the impact of the forty-one contracts on CVP operation. Because the 2008 opinion has been held, in part, unlawful, and it is unclear if the contracts at issue were considered in that opinion, this case is not moot on appeal.

## C. Standing

Plaintiffs argue that the district court erred in holding that they did not have standing to challenge the DMC contracts. To invoke the jurisdiction of the federal courts, a plaintiff must have Article III standing. *Salmon Spawning & Recovery Alliance*, 545 F.3d at 1224-25. To establish Article III standing, a plaintiff must show that: "(1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Id.* at 1225. If a plaintiff asserts a procedural injury, he must show that the procedures are designed to protect a concrete threatened interest and, once shown, his burden for showing causation and redressability is lessened. *Id.* at 1226. In that case, plaintiffs "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Id.* (quoting *Defenders of Wildlife v. U.S. E.P.A.*, 420 F.3d 946, 957 (9th Cir. 2005), *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)).

[2] In this case, the district court properly held that plaintiffs do not have standing to challenge the DMC contracts. Plaintiffs' assertion that the DMC contracts are based on an improper biological opinion is an assertion of a procedural

violation. *See Defenders of Wildlife*, 420 F.3d at 957 (claim asserting an inadequate consultation between the Environmental Protection Agency and Fish and Wildlife Service asserts a procedural violation). Plaintiffs satisfy the injury-in-fact requirement by their assertion that they believe that the Bureau has overcommitted water under the contracts which will harm the delta smelt. *See Salmon Spawning & Recovery Alliance*, 545 F.3d at 1225-26. However, plaintiffs fail to establish a causal connection between the threatened injury and the Bureau's action because the DMC contracts include a shortage provision. The shortage provision expressly allows the Bureau to take any action to meet its legal obligations, which includes not delivering water to DMC Contractors if it is necessary in order to comply with § 7(a)(2) of the ESA. The DMC contract terms, therefore, expressly require that water delivery be subject to the requirements of Federal law and that the Bureau may discontinue or reduce the quantity of water delivered to the DMC Contractors. The threatened injury, *i.e.*, jeopardy to the delta smelt, would not be traceable to the contract renewals because such contracts expressly allow for § 7(a)(2) compliance. With no threatened injury there is nothing to redress. Even under a substantive claim analysis for standing, which imposes a higher burden than a procedural analysis, plaintiffs' claim fails because they cannot show causation. *See Warth v. Seldin*, 422 U.S. 490, 506-08 (1975) (facts asserted failed to show causation for Article III standing). Thus, the district court properly determined that plaintiffs lack standing to challenge the DMC contracts under both a procedural and a substantive claim analysis.

## D. NON-DISCRETIONARY CONTRACTS

**[3]** Plaintiffs argue that the district court erred in holding that their claims as to the Settlement Contracts fail because those contracts do not require compliance with § 7(a)(2) of the ESA. Section 7(a)(2) of the ESA only applies to federal agency action "in which there is discretionary Federal involvement or control." *Nat'l Ass'n of Home Builders v.*

*Defenders of Wildlife*, 551 U.S. 644, 666 (2007) ("*Home Builders*") (quoting 50 C.F.R. § 402.03). In *Home Builders*, the Supreme Court held § 7 did not apply to the Environmental Protection Agency's ("EPA") approval of an application for Arizona to administer a program under the Clean Water Act because this was not a discretionary act of the agency. *Id.* at 666-67. The salient provisions of the Clean Water Act mandated that the EPA approve the application once nine statutory criteria under 33 U.S.C. § 1342(b) were met. *Id.* If the nine criteria were met, the EPA lacked discretion to deny the application, regardless of § 7(a)(2) requirements. *Id.* Because the EPA's discretion was so limited in determining whether to approve the applications, it did not trigger the requirements under § 7(a)(2) of the ESA. *Id.* at 673. The Court stated that "[a]s the mandatory language of [50 C.F.R.] § 402(b) itself illustrates, not every action authorized, funded, or carried out by a federal agency is a product of that agency's exercise of discretion." *Id.* at 668.

**[4]** In this case, the district court properly held that the Bureau's renewal of the Settlement Contracts is not subject to § 7(a)(2) of the ESA because its action is not a "discretionary action." Under § 8 of the Reclamation Act of 1902, the Bureau must operate the CVP in conformity with California water law on the "control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder." 43 U.S.C. § 383; *California v. United States*, 438 U.S. 645, 675-79 (1978) (holding that California may impose conditions on permits granted to the United States for CVP operation). Section 8 includes the "full recognition" of any "vested right acquired" under California water law. 43 U.S.C. § 383; *United States v. Gerlach Live Stock Co.*, 339 U.S. 725, 734 (1950). Under California law, senior appropriative water rights must be satisfied before junior water rights. *Pasadena v. Alhambra*, 33 Cal. 2d 908, 926 (1949). The Central Valley Project Improvement Act ("CVPIA"), Pub.L. 102-575, 106 Stat. 4714 (1992), requires the Bureau to operate the CVP in compliance with "all decisions of the California Water

Resources Control Board." CVPIA § 3406(a). The California Water Resources Control Board issued Decision 990 in which it agreed to grant the Bureau rights to operate the CVP *only if* it addressed the issue of those claiming to hold senior water rights. Under the Settlement Contracts, negotiated at the behest of the California Water Resources Control Board, the Bureau is required to deliver base supply water for free and that the supply may only be reduced by 25% in critically dry years. The duty to deliver the base supply water is mandatory. Under the contracts, the contractors are entitled to 100% of their base water, which can only be reduced by 25% in very dry years. Under the CVPIA, the Bureau is *required to renew these contracts upon request. See* CVPIA § 3404(c).

[5] Here, the Bureau's discretion is limited with regard to the Settlement Contracts so that § 7(a)(2) of the ESA is not triggered. The Bureau's hands are tied historically by those asserting senior water rights in the CVP. The Bureau was required to acknowledge such rights in order to operate the CVP, which it did by entering the Settlement Contracts. We agree with the district court, which held

> Plaintiffs' claims fail as to the [Settlement Contracts] because [the Bureau's] discretion is substantially constrained by prior contract. Therefore, following the Supreme Court's decision in *Home Builders*, [551 U.S. 644], Section 7(a)(2) of the ESA does not apply to the [Settlement] Contract renewal process. Specifically, Article 9(a) of the [Settlement] Contracts requires [the Bureau] to renew these contracts for the same quantity of water, the same allocation of water between base supply and project water, and the same place of use on specifically designated land as the original contracts. By executing the original [Settlement] Contracts, [the Bureau] surrendered its power to change these terms. Article 9(a) of the [Settlement] Contracts provides for the exact definition of water rights achieved in the original [Settlement]

Contracts to be preserved upon renewal. This substantially constrains [the Bureau's] discretion to reduce diversions of Sacramento River System water for the benefit of the Delta smelt or any other reason, by fixing [Settlement] Contractor quantities, allocations, and places of use upon renewal.

*Natural Res. Def. Council v. Kempthorne*, No. 1:05-cv-1207, 2009 WL 1575208, at *2 (E.D. Cal. June 3, 2009).

## III.   CONCLUSION

**[6]** We hold that the district court properly granted summary judgment for defendants, finding that plaintiffs lack standing with regard to the DMC contracts and that § 7(a)(2) of the ESA does not apply to the Settlement Contracts.

**AFFIRMED.**

---

PAEZ, Circuit Judge, dissenting:

I respectfully dissent. I agree with the majority that this case is not moot. I disagree with the majority's holdings that the plaintiffs lack standing to challenge the Bureau's renewal of the Delta-Mendota Canal ("DMC") contracts and that § 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), does not apply to the United States Bureau of Reclamation's ("Bureau") renewals of the Sacramento River Settlement ("SRS") contracts. Accordingly, I would reverse the district court's grant of summary judgment to the defendants and remand for further proceedings.

## I

I can not agree with the majority's holding that the plaintiffs lack standing to challenge the Bureau's renewals of the

DMC contracts. Because the plaintiffs allege a straightforward procedural injury, they "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis in original), *overruled on other grounds by Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). In my view, the plaintiffs have easily made such a showing.

The plaintiffs argue that the Bureau violated the ESA when it renewed the 41 contracts at issue in this case—including the DMC contracts—without consulting with the United States Fish and Wildlife Service (the "Service") on whether its actions were "likely to jeopardize the continued existence of" the delta smelt, a threatened species. *See* ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).[1] I agree with the majority's conclusion that the plaintiffs alleged a procedural injury. Our precedent makes clear, then, that the plaintiffs have standing if they can demonstrate that ESA compliance by the Bureau *could* advance their concrete interest in protecting the delta smelt and its habitat. *See Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008); *Defenders of Wildlife,* 420 F.3d at 957.

The plaintiffs have presented extensive evidence from which a reasonable factfinder could conclude that the Bureau's ESA compliance would likely improve the conditions of the delta smelt and its habitat.[2] For example, the

---

[1]ESA § 7(a)(2) provides that, "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536(a)(2).

[2]Because we are reviewing a grant of summary judgment to the defendants, we must resolve all factual disputes in favor of the plaintiffs in determining whether they have standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

plaintiffs allege that if the Bureau were to consult with the Service on the DMC contracts, it might choose to provide *less water* to the contractors, which would improve the conditions of the delta smelt and its habitat. The plaintiffs also allege that consultation by the Bureau might result in a *pricing structure* that is more protective of the delta smelt and its habitat. Finally, the plaintiffs allege that if the Bureau were to consult on the contracts, it might choose to alter the *timing* of water deliveries, which could inure to the benefit of the delta smelt and its habitat. The plaintiffs' allegations and the record evidence to support them would allow a reasonable factfinder to conclude that the Bureau's ESA compliance *could* further the plaintiffs' concrete interest in protecting the delta smelt and its habitat. On this record, I would hold that the plaintiffs have standing to challenge the DMC contracts.

The majority places unwarranted emphasis on the shortage provision of the DMC contracts. As the majority explains, this provision allows the Bureau to forsake water deliveries to the DMC contractors as necessary to comply with the ESA.[3] The majority concludes that because the terms of the DMC contracts authorize the Bureau to comply with the ESA, the plaintiffs do not have standing to assert a claim that the Bureau is violating the consultation requirement of ESA § 7(a)(2). This reasoning makes no sense. That the contracts *allow* the Bureau to comply with the ESA certainly does not *ensure* that the Bureau will do so. The plaintiffs contend that the Bureau violated the ESA; the fact that the DMC contracts contain a shortage provision tells us nothing about whether the plaintiffs are right.[4] Therefore, I dissent from the majority's hold-

---

[3]Specifically, as the district court noted, each DMC contract contains a provision that expressly allows the Bureau to take actions to protect Delta smelt, including not delivering any water to DMC contractors if required to comply with section 7(a)(2) . . . ." *NRDC v. Kempthorne* (*NRDC I*), 2008 WL 5054115 at *15 (E.D. Cal. 2008).

[4]In addition to a shortage provision, the DMC contracts also contain a liability-release provision that "relieves the Bureau of liability for any

ing that the plaintiffs lack standing to challenge the Bureau's renewals of the DMC contracts at issue in this case.

**II**

I also disagree with the majority's holding that the requirements of ESA § 7(a)(2) do not apply to the Bureau's renewals of the SRS contracts. Pursuant to 50 C.F.R. § 402.03, the requirements of ESA § 7(a)(2) "apply to all actions in which there is discretionary Federal involvement or control." The Supreme Court upheld this regulation in *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, stating, "§ 7(a)(2)'s no-jeopardy duty covers only discretionary agency actions and does not attach to actions . . . that an agency is *required* by statute to undertake once certain specified triggering events have occurred." 551 U.S. 644, 669 (2007) (emphasis in original). I disagree with the majority's conclusion that the Bureau's renewals of the SRS contracts were not discretionary agency actions.

A federal agency action is not discretionary when "consultation would be a meaningless exercise" and when "the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995). For example, when an agency "cannot simultaneously obey the differing mandates set forth in [ESA] § 7(a)(2)" and another

direct or indirect damage arising from reduced deliveries to DMC Contractors as a result of, among other things, actions taken by the Contracting Officer to meet legal obligations." *NRDC I*, 2008 WL 5054115 at *15 (internal quotation marks omitted). I see one feature of the liability-release and shortage provisions that could inform our standing analysis, and it favors the plaintiffs' redressibility argument. Because the liability-release and shortage provisions give the Bureau the ability to comply with the ESA without breaching the DMC contracts, these provisions guarantee that the DMC contracts are not a barrier to the Bureau's ability to redress the plaintiffs' alleged injuries.

statutory provision, the agency need not follow § 7(a)(2). *See Home Builders*, 551 U.S. at 666 (holding that EPA action was not discretionary where mandated by the Clean Air Act); *see also Babbitt*, 65 F.3d at 1509. On the other hand, "if the project's implementation depend[s] on additional agency action," then the agency "c[an] not avoid the procedural requirements of section 7(a)(2)." *Babbit*, 65 F.3d at 1509; *see also Karuk Tribe of California v. U.S. Forest Serv.*, ___ F.3d ___, 2012 WL 1959231, *17 (9th Cir. 2012) (en banc) ("Under our established case law, there is 'agency action' sufficient to trigger the ESA consultation duty whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed.").

The plaintiffs contend that the Bureau's renewals of the SRS contracts were discretionary actions for two reasons: (a) because the Bureau could have chosen simply to not renew the SRS contracts; and (b) because the Bureau could have negotiated terms in the renewed SRS contracts that were protective of the delta smelt and its habitat. I agree with the plaintiffs.

## A.   Discretion Not to Renew the SRS Contracts

### 1.   *Central Valley Project Improvement Act*

The majority holds that the Central Valley Project Improvement Act ("CVPIA") § 3404(c) compels the Bureau to renew the SRS contracts. Op. at 8180-81. I disagree. CVPIA § 3404(c) provides, "the Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years and may renew such contracts for successive periods of up to 25 years each." CVPIA § 3404(c), 106 Stat. 4600, 4707 (1992). By its terms, CVPIA § 3404(c) applies only to "long-term repayment [and] water service" contracts. There are several reasons to conclude that

the SRS contracts are not "water service" contracts within the meaning of § 3404(c).[5]

First, the CVPIA expressly distinguishes SRS contracts from "water service" contracts in another section, § 3405(a).[6] Section 3405(a) thus demonstrates that Congress considered "water service" contracts and settlement contracts to be two distinct categories of contracts. *Accord Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.").

Second, § 3404(c) refers to contracts for "water from the Central Valley Project." The CVPIA defines "Central Valley Project water" as "[a]ll water that is developed, diverted, stored or delivered *by the Secretary* in accordance with the statutes authorizing the Central Valley Project and in accordance with the terms and conditions of water rights acquired pursuant to California Law." § 3403(f) (emphasis added). The SRS contractors persuasively argue that the water they use is not "Central Valley Project water" because it is not diverted by the federal government. Rather, the SRS contractors divert water directly from the Sacramento River. Because the SRS contracts do not involve "Central Valley Project water," § 3404(c) seems inapplicable.

Third, until this litigation, the Bureau had taken the position that the SRS contracts are not "water service" contracts within the meaning of § 3404(c).[7] Of course, that the Bureau

---

[5]It is undisputed that the SRS contracts are not "long-term repayment" contracts, as referenced in § 3404(c).

[6]Section 3405(a) gives "all individuals or districts who receive Central Valley Project water under water service or repayment contracts, water rights settlement contracts, *or* exchange contracts" the right to transfer water. (emphasis added).

[7]For example, in its 2004 EIS on the SRS contract renewals, the Bureau explained that "[t]he CVPIA expressly distinguishes Settlement Contracts

has changed course is not fatal to its argument, but it is powerful evidence that Congress did not intend § 3404(c) to apply to the SRS contracts.[8] Moreover, in 2004 Congress passed a rider to is appropriations bill that provided two additional years for the SRS contracts to be renewed, apparently contemplating the possibility that the SRS contracts would otherwise expire. Energy Water Development Appropriation Act, Pub. L. No. 108-137, 117 Stat. 1827 (2003). For these reasons, I would hold that CVPIA § 3404(c) does not require renewal of the SRS contracts.

### 2.  *State Water Resources Control Board Decision 990*

I disagree with the majority's holding that a decision of California's State Water Resources Control Board (SWRCB) requires the Bureau to renew the SRS contracts. Op. at 8181. In 1961, the SWRCB issued Decision 990 ("D-990"), which granted the Bureau state water permits to operate the CVP. Federal law requires the Bureau to comply with this decision. 43 U.S.C. § 383; *see also California v. United States*, 438 U.S. 645, 653 (1978).

The SRS contractors argue that Condition 23 of D-990 compels the Bureau to renew the SRS contracts. Condition 23 provides:

The export of stored water under [the applicable per-

---

from 'CVP water service contracts' or 'repayment contracts.' " The Bureau even noted that "it is common for commentors to mistake CVPIA provisions relating to other types of contracts (i.e. water service contracts or repayment contracts, sometimes referred to as 9(e) contracts) as relating to all types of CVP water contracts. This is not the case. . . . [T]he provision in Section 3404(c) limiting the term of repayment and water service contracts to a period not to exceed 25 years not apply to the Settlement Contracts." ER 1844-45.

[8]The Bureau now characterizes the SRS contracts as "hybrid" contracts that are "both water service and settlement contracts." The CVPIA, however, does not refer to "hybrid" contracts.

mits] outside the watershed of Sacramento River Basin or beyond the Sacramento-San Joaquin Delta shall be subject to the reasonable beneficial use of said stored water within said watershed and Delta, both present and prospective, provided, however, that agreements for the use of said stored water are entered into with the United States prior to March 1, 1964, by parties currently diverting water from Sacramento River and/or Sacramento-San Joaquin Delta. . . .

Like the district court, I read Condition 23 to have simply imposed a deadline—March 1, 1964—by which the parties were required to enter into the SRS contracts. It seems implausible that Condition 23 meant that the SRS contracts, entered for 40-year terms, were permanent. Therefore, I would reject the SRS contractors' argument that D-990 compels renewal of the SRS contracts.

Having concluded that the Bureau has discretion simply not to renew the SRS contracts, I would hold that the Bureau must comply with ESA § 7(a)(2). *See, e.g.*, *NRDC v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1998); *Turtle Island v. Nat'l Marine Fisheries Serv.*, 340. F3d 969, 977 (9th Cir. 2003).

## B.   Discretion to Negotiate the Terms of the SRS Renewal Contracts

### 1.   *Contract Language*

The majority holds that a provision contained in the original SRS contracts constrains the Bureau's discretion to negotiate terms upon renewal that might inure to the benefit of the delta smelt.[9] I disagree. Because I would conclude that the

---

[9]As the district court noted, "[u]nder certain circumstances, a prior agreement, permit, or management decision that predates the listing of a species may constrain a federal agency's ability to take action on behalf of that listed species, absolving the agency from the requirement of consultation." *NRDC II*, 621 F.Supp.2d at 976 (E.D. Cal. 2009) (citing *Babbitt*, 65 F.3d at 1509).

original SRS contracts do not prevent the Bureau from renewing the SRS contracts on terms that might benefit the delta smelt and its habitat, I would hold that the Bureau must comply with the consultation requirements of ESA § 7(a)(2). *See Houston*, 146 F.3d at 1126 (holding that "there was discretion available to the Bureau during the negotiation process" where, like here, the government was entitled to renew water contracts on "mutually agreeable" terms).

The district court correctly noted that we must "look to general principles concerning the interpretation of contracts" in interpreting a contract to which the United States is a party. *NRDC v. Kempthorne* (*NRDC II*), 621 F.Supp.2d 954, 980 (E.D. Cal. 2009). One of the bedrock principles of contract interpretation is that "[a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999) (quoted in *NRDC II*, 621 F.Supp.2d at 980). Moreover, we must interpret the SRS renewal contracts "so as to avoid internal conflict." *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 566 (9th Cir. 1988) (quoted in *NRDC II*, 621 F.Supp.2d at 980).

I disagree with the majority's holding that Article 9(a) of the original SRS contracts prevents the Bureau from negotiating the terms of the renewed SRS contracts. Article 9(a) of each original SRS contract provides:

> (a) During the term of this contract and any renewal thereof:
>
>> (1) It shall constitute the full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between the base supply and Project Water which may be diverted by the Contractor from the Sacramento River for

> beneficial use . . . which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all its obligations hereunder; and

> (2) The Contractor shall not claim any right against the United States in conflict with the provisions thereof.

Like the district court, the majority interprets Article 9(a) to mean that the terms of the original SRS contracts constitute full agreement on all material terms, for all future renewals of the contracts. Op. at 8181-82. Read in isolation, Article 9(a)'s use of the phrase "full agreement" does seem to preclude the possibility of renegotiating the terms of the SRS contracts upon renewal. Read in context, however, the majority's interpretation is unworkable because Article 2 of each SRS contract provides:

> This contract shall remain in effect until and including March 31, 2004: <u>Provided</u>, That under terms and conditions *mutually agreeable to the parties hereto*, renewals may be made for successive period not to exceed forty (40) years each. The *terms and conditions of each renewal shall be agreed upon* not later than one (1) year prior to the expiration of the then existing contract. . .

(emphasis added). The language of Article 2 strongly suggests that the parties anticipated renegotiating the terms of the SRS contracts upon renewal.

In light of Article 2 and the history of the SRS contracts, I interpret Article 9(a) to be a partial integration clause, which merely guarantees that each SRS contract (and renewal thereof) constitutes a "full agreement" between the parties with respect to water quantity and allocation. In other words, it appears that Article 9(a) was included in each SRS contract

to avoid litigating the extent of the SRS contractors' underlying water rights.[10] The majority's interpretation—that Article 9(a) freezes in perpetuity the precise water quantity and allocation terms of each SRS contract—is illogical in light of Article 2, which expressly states that the terms and conditions of the renewal contracts must be "mutually agreeable." Thus, I would hold that Articles 2 and 9(a) must be harmonized, and that the only sensible reading of Article 9(a) is that it is a partial integration clause.

Moreover, even if Article 9(a) did constrain the Bureau's discretion to renegotiate the water quantity and allocation terms of the SRS contracts upon renewal—which I do not think it does—the plaintiffs persuasively point out that Article 9(a), by its terms, does not constrain the Bureau's discretion to renegotiate non-quantity contract terms, such as the terms governing the pricing and timing of water deliveries. Because the Bureau has discretion to negotiate terms of the SRS renewal contracts that could inure to the benefit of the delta smelt, I would hold that it must comply with ESA § 7(a)(2). I therefore dissent from the majority's holding that the Bureau was not required to comply with the consultation requirements of § 7(a)(2) in renewing the SRS contracts.

### III

For the foregoing reasons, I would reverse the district court's grant of summary judgment to the defendants and remand this case to the district court for consideration in the first instance of the merits of the plaintiffs' claims involving the DMC contracts and for further consideration of the plaintiffs' claims involving the SRS contracts.

---

[10]The Bureau and the Sacramento River water users entered the SRS contracts in 1964 after the SWRCB instructed the parties to reach a settlement agreement rather than engage in a "lengthy and extremely costly adjudication of the waters of the Sacramento River and its tributaries."